STATE of Missouri, Respondent,

v.

Rickey STALLINGS, Appellant.

No. WD 63129.

Missouri Court of Appeals, Western District.

March 29, 2005.

Kent Denzel, Columbia, MO, for appellant.

Deborah Daniels, Jefferson City, MO, for respondent.

Before SMART, P.J., ELLIS and HARDWICK, JJ.

LISA WHITE HARDWICK, Judge.

Rickey Stallings was convicted on one count of forgery, § 570.090, R.S.Mo.2000, and sentenced to a ten-year prison term. On appeal, he challenges the sufficiency of the evidence to support his conviction, alleges instructional error, and seeks plain error review of comments made during the State's closing argument. We affirm.

FACTUAL AND PROCEDURAL HISTORY

In April 2002, Stallings was incarcerated at the Algoa Correctional Center, having served thirteen years of his twenty-three year sentence for various felony offenses. He worked as a clerk in the prison's library.

On April 22, 2002, an office assistant in the Algoa records department opened a manila envelope that came from the message center, a room where mail was sorted for delivery to various departments in the prison. The unsealed envelope appeared to have been sent through inter-agency mail from the Fulton Reception and Diagnostic Center. Among the documents in the envelope was a four-page order, purportedly from the St. Louis County Circuit Court, stating that Stallings' prison sentence had been reduced to thirteen years. Upon review of the order, Algoa records officer Teresa Adams became suspicious that it was not authentic. Adams noticed the order had no original signatures and the court clerk's certification on the last page did not include an embossed seal.

Subsequent investigation revealed there was no order in Stallings' court file to amend or otherwise reduce his prison sentence. The order that arrived in the Algoa records department was determined to be a forgery, with a photocopied signature of the sentencing judge and a photocopied certification seal. The document was sent to the Missouri State Highway Patrol laboratory for fingerprint testing. Four of Stallings' thumbprints were found on pages of the forged document.

Stallings was charged with one count of forgery. At the jury trial, the State presented evidence that Stallings, as a clerk, had access to electronic typewriters and a copy machine in the prison library. Li-

brary clerks also were permitted to enter the message center without supervision. A Highway Patrol official identified Stallings' fingerprints on the counterfeit document. A prison official testified that although outgoing inmate mail was generally checked for contraband and inappropriate content an envelope marked as "legal mail" would not be opened unless it was suspected of containing contraband.

The jury found Stallings guilty of forgery. The trial court sentenced him, as a prior and persistent offender, to a prison term of ten years, to be served consecutively to his existing sentence.

### SUFFICIENCY OF THE EVIDENCE

■ In his first point on appeal, Stallings contends the trial court erred in entering the judgment of conviction because the evidence was insufficient to prove he committed forgery under Section 570.090. Our review of this point is limited to determining whether the jury had substantial evidence from which to find the defendant guilty beyond a reasonable doubt. *State v. Chaney*, 967 S.W.2d 47, 52 (Mo.banc 1998). In making this determination, we accept as true all the evidence favorable to the State, including all favorable inferences drawn therefrom, and disregard all contrary evidence and inferences. *Id.* We will not weigh the evidence or determine the credibility of witnesses, as that is within the jury's province. *Id.*

Stallings was charged with committing a forgery in violation of Section 570.090, which provides in relevant part:

1. A person commits the crime of forgery if, with the purpose to defraud, he

 (1) Makes, completes, alters or authenticates any writing so that it purports to have been made by another or at another time or place or in a numbered sequence other than was in fact the case or with different terms or by authority of one who did not give such authority; or . . .

 (4) Uses as genuine, or possesses for the purpose of using as genuine, or transfers with the knowledge or belief that it will be used as genuine, any writing or other thing which the actor knows has been made or altered in the manner described in this section.

Stallings argues the evidence was insufficient to find that he *transferred* a forged writing, as required in Section 570.090.1(4). The term "transfer" is not defined in the statute. Stallings contends the applicable dictionary definition of "transfer" is "to make over or negotiate the possession or control of (a right, title, or property) by a legal process usu[ally] for consideration." *WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY* 2427 (1981). He relies on *State v. Conaway*, 824 S.W.2d 50, 53 (Mo.App.1991), wherein the court applied this definition and held the evidence was sufficient to support a forgery conviction because a "transfer" took place when the defendant negotiated fraudulently-endorsed checks by depositing them into his bank account. Stallings argues that *Conaway* indicates the "clear legislative intent [of § 570.090.1(4) ] to use the term 'transfer' in its financial sense." Because there was no evidence that he negotiated a financial instrument, Stallings contends the State failed to prove the element of transfer.

■ When a statutory term is undefined, we must apply its common sense, dictionary meaning, in the absence of an indication of specialized use. *State v. Trotter*, 5 S.W.3d 188, 193 (Mo.App.1999). The common meaning of "transfer" is not limited to the negotiation of financial documents; *Webster's* dictionary also defines the term as "to cause to pass from one

person or place to another: transmit." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2427 (1993). Similarly, Black's Law Dictionary offers several definitions of "transfer," including "[t]o convey or remove from one place or one person to another; to pass or hand from one to another[.]" BLACK'S LAW DICTIONARY 1504 (7th Ed.1999). This use of the term was apparent in *State v. Pride*, 1 S.W.3d 494, 499–501 (Mo.App. 1999), where we found the defendant demonstrated the requisite intent to commit forgery by *faxing* fraudulent copies of a cashier's check and a certificate of insurance.

■ Forgery is a crime that can be committed by transferring a fraudulent writing in several ways. In *Pride*, the defendant's "transfer" was the transmission of a facsimile, whereas in *Conaway* it was the depositing of a check. The applicable common sense meaning of the term depends on the factual situation. In light of the circumstances here, the State sought to apply the term as used in *Pride*, by proving that Stallings transferred the fraudulent court order by placing it in the prison mail system. The State's theory was a reasonable application of the dictionary definition of "transfer" as the conveyance or removal of an object from one place to another.

We also find that the evidence at trial supported the State's theory. Prison officials testified that Stallings had access to typewriters and a copy machine, which would have equipped him to prepare the court order. The fingerprint evidence provided direct proof that Stallings handled and had knowledge of the counterfeit document. Testimony further established that, as a library clerk, Stallings had unsupervised access to Algoa's message center, from which the envelope containing the fraudulent order was dispatched to the records department. Stallings also had a reason to perpetrate the crime, in that he had served thirteen years of his twenty-three year sentence, and the falsified court document would have cleared the way for his immediate release from prison.

■ Based on this evidence, the element of "transfer" was circumstantially established by proof that Stallings had the means, opportunity, and motive to commit the forgery.[1] There was substantial evidence from which the jury could reasonably infer that Stallings prepared the forged document and then used the prison mail system to transfer it from the message center to the records department. Accordingly, the evidence was sufficient to support the determination that Stallings was guilty of forgery beyond a reasonable doubt. Point I is denied.

### JURY INSTRUCTIONS

■ In Point II, Stallings contends the trial court erred in giving a disjunctive jury instruction regarding accomplice liability because there was no evidence to support this theory. The trial court overruled Stallings' objection to Instruction No. 6, which stated in relevant part:

If you find and believe from the evidence beyond a reasonable doubt:

---

1. As we recognized in *State v. Nelson*, 895 S.W.2d 289, 292 (Mo.App.1995), "[c]ircumstantial evidence is perfectly valid and can be essential in a forgery case where a defendant's knowledge can likely be established no other way." Circumstantial evidence need not be absolutely conclusive of guilt and need not demonstrate the impossibility of innocence. *State v. O'Haver*, 33 S.W.3d 555, 559–60 (Mo.App.2000). Substantial evidence of guilt can be established by proof that the defendant had the means, motive, and opportunity to commit the charged crime. *Id.* at 560; *State v. Sherman*, 927 S.W.2d 350, 354 (Mo.App.1996).

First, that on or about April 22, 2002, in the County of Cole, State of Missouri, the defendant transferred with the knowledge or belief that it would be used as genuine, St. Louis County Circuit Court document, a writing, and

Second, that defendant knew this writing has been made so that it purported to have authority of one who did not give such authority, and

Third, that defendant did so with the purpose to defraud, then you are instructed that the offense of forgery has occurred, and if you further find and believe from the evidence beyond a reasonable doubt:

Fourth, *that defendant acted alone or with the aid of another person in committing that offense[;]*

then you will find the defendant guilty of forgery.

(emphasis added). The argument on appeal focuses on paragraph Fourth, where the State sought to submit the forgery charge under alternative theories of individual or accomplice liability. Stallings correctly argues that by submitting the alternatives in the disjunctive, the State was required to present substantial evidence in support of both theories. *State v. Puig,* 37 S.W.3d 373, 377 (Mo.App.2001).

As discussed under Point I, the evidence at trial was sufficient to prove that Stallings could have acted alone in committing the forgery by placing the counterfeit court order in the prison mail system during his unsupervised work visits to the message center. But the State also presented evidence of another means of commission. An Algoa prison official testified that outgoing inmate mail was generally checked for contraband and scanned for inappropriate content (such as threatening remarks); however, any envelope marked as "legal mail" would not be opened without specific grounds for suspecting contraband. Other testimony established that court-related inmate mail was frequently sent to the Fulton Reception and Diagnostic Center for sorting and delivery to the appropriate prison by inter-agency mail. Collectively, this testimony allowed an inference that Stallings could have sent the falsified order, under the guise of "legal mail," outside the prison for someone else to mail to the Fulton clearinghouse, where it would then be forwarded to Algoa as inter-agency mail.

The evidence was sufficient to support a finding that Stallings either acted alone or with the aid of another person. Point II is denied, as the trial court did not err in submitting Instruction No. 6 under the alternative theories of individual or accomplice liability.

### CLOSING ARGUMENT

In his final point on appeal, Stallings contends the trial court plainly erred in failing to prevent, *sua sponte,* the prosecutor from misstating the evidence during closing argument. Because Stallings failed to object to the prosecutor's statements, he seeks review of his claim under the plain error standard.

Pursuant to Rule 30.20, we have discretion to review for "plain errors affecting substantial rights." This review involves a two-step process. First, we determine whether the claim of error facially establishes substantial grounds for believing that manifest injustice or a miscarriage of justice has resulted. *State v. Hagan,* 113 S.W.3d 260, 267 (Mo.App.2003). Plain error is evident, obvious, and clear. *State v. DeWeese,* 79 S.W.3d 456, 457 (Mo.App. 2002). Absent a finding of facial error, an appellate court should decline its discretion to review the claim. *Hagan,* 113 S.W.3d at 267. If plain error is found, we proceed

to the second step to consider whether the error actually resulted in manifest injustice or a miscarriage of justice. *Id.*

 "The plain error rule is to be used sparingly and may not be used to justify a review of every point that has not been otherwise preserved for appellate review." *State v. Tokar,* 918 S.W.2d 753, 769 (Mo. banc 1996). Statements made in closing argument will rarely amount to plain error, and any assertion that the trial court erred for failure to intervene *sua sponte* ignores the possibility that an attorney may not have objected for strategic reasons. *State v. Cole,* 71 S.W.3d 163, 171 (Mo. banc 2002). Without an objection, "the trial court's options are narrowed to uninvited interference with summation and a corresponding increase of error by such intervention." *State v. Clemmons,* 753 S.W.2d 901, 908 (Mo. banc 1988).

During closing argument, the prosecutor explained the State's theory as to how Stallings transferred the falsified court order:

Now, that he transferred this to Algoa, you know, literally we don't know exactly where it went, how it got there. We know that it had been up in that message center mail room on [April] 22nd. And it came from the records department and ended up in an envelope that was not sealed that seemed to have come from the Fulton Diagnostic Center. So the inference would be that it was either in there and came from Fulton or somebody dropped it in there. And that's probably about it.

Nobody can tell you how it got there, except we know that the defendant is a law clerk. We heard that law clerks had access. He was a law clerk at the time.

We also heard that the mail, *if you just wrote "legal mail" on the outside of an envelope, it would go out and it would not be opened, it would not be read unless there was something that aroused suspicion.* So it's quite possible that it could have gone out of the prison with U.S. mail, with instructions to send it to Algoa.

(emphasis added). Stallings argues the prosecutor's statement that legal mail would not be opened was contrary to the evidence at trial. He contends Algoa's investigator, Ben Wilson, testified that *all* outgoing inmate mail is checked for contraband and should be scanned for improper content and, if the envelope is marked as "legal mail," the prison staff also checks to be sure that the addressee is actually an attorney.

Upon review of the trial transcript, we find nothing to support Stallings' characterization of Wilson's testimony regarding *all* outgoing inmate mail. On direct examination by the State, Wilson explained that legal mail is not subject to the stringent review procedures of other outgoing inmate mail:

Q: All right. Now when an inmate mails a letter from Algoa is their mail read by someone?

A: Um, normally the mail is checked for contraband. They should check it for contraband. She should also scan it for any type of illegal terms, drug terms, stuff like that. Any kind of threatening remarks. The only mail that's not read that I'm aware of, according to policy, is legal mail. Stuff that's marked legal mail.

Q: So if I was an inmate at Algoa and had an envelope with papers in it and wrote to John Jones, Attorney at Law, St. Louis, Missouri, and then I wrote in big letters, legal mail, would that get read?

A: No. Normally they should check to make sure that it's going to an at-

torney. They have a book in the mailroom that has a list of attorneys statewide, and they should verify that that's going to an attorney, not somebody that's fictitious.

Q: Is that always done?

A: I don't know. I don't work in the mailroom.

Q: But if it says legal mail, but it doesn't have an attorney's name on it, it says legal mail?

A: If it says legal mail nobody touches it. Unless we suspect it has contraband in it going out and then it would have to be opened in front of the individual.

Q: If you had no reason to suspect a problem, and it says legal mail on the outside of it, would it be opened?

A: No.

Wilson's testimony was fully consistent with the prosecutor's statement during closing argument that an envelope marked "legal mail" would not be opened unless it aroused suspicion of contraband. The trial court did not err in allowing the prosecutor's statement because it was supported by evidence in the record. Finding no error, we decline plain error review and deny Point III of the appeal.

The judgment of the trial court is affirmed.

All concur.