**STATE of Missouri, Plaintiff– Respondent,**

v.

**Theodore James WOODMANSEE, Defendant–Appellant.**

No. 27198.

Missouri Court of Appeals, Southern District, Division Two.

Oct. 17, 2006.

288

Nancy A. McKerrow, Columbia, MO, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Cecily L. Daller, Asst. Atty. Gen., Jefferson City, MO, for Respondent.

JEFFREY W. BATES, Chief Judge.

Theodore J. Woodmansee (Defendant) was charged by amended information with the commission of the following offenses: (1) Count I—the class A felony of assault

of a law enforcement officer in the first degree in violation of § 565.081; and (2) Count II—the class C felony of assault of a law enforcement officer in the second degree in violation of § 565.082.[1] In addition, the information alleged that Defendant was a prior and persistent offender. Prior to trial, the court made an express finding to that effect on the record. Defendant was found guilty of both offenses by a jury. The court imposed consecutive sentences of imprisonment for 25 years on Count I and 10 years on Count II. Defendant presents one point on appeal. He contends the trial court erred in failing to sustain his objection to a statement during the prosecutor's rebuttal argument which misstated the evidence and thereby prejudiced his defense. We affirm.

## I. Factual and Procedural Background

As Defendant does not challenge the sufficiency of the evidence to sustain his convictions, we consider the facts and all reasonable inferences derived therefrom in a light most favorable to the verdict. *State v. Dillard*, 158 S.W.3d 291, 294 (Mo. App.2005). We disregard all contrary evidence and inferences. *State v. Lawrence*, 64 S.W.3d 346, 348–49 (Mo.App.2002). Viewed from that perspective, the favorable evidence and inferences supporting the State's case against Defendant are summarized below.

The Southwest Fugitive Task Force (Task Force) is a collaborative effort by several law enforcement agencies to locate and arrest fugitive suspects in southwest Missouri. The Task Force includes officers from the United States Marshal's Office, the Missouri Highway Patrol, the Greene County Sheriff's Office and the Missouri Department of Corrections. Defendant was wanted on an outstanding federal arrest warrant, and the Task Force had been seeking information concerning Defendant's whereabouts for several weeks.

On September 10, 2004, the Greene County Sheriff's Office received information that Defendant could be found at a residence on North Ethyl Street in Springfield, Missouri. This information was communicated to the Task Force, and a number of officers were dispatched to that location to arrest Defendant. The officers included Greene County Detective Jim Stanley (Stanley), Greene County Lieutenant Randall Gibson (Gibson), Missouri Highway Patrol Sergeant Robert Proctor (Proctor), Special Deputy United States Marshal Terry Kenslow (Kenslow), Deputy United States Marshal Mike Walker (Walker) and Deputy United States Marshal Randy Aug (Aug).

The Task Force officers met for a security briefing near the residence where Defendant was believed to be staying and received their respective assignments for securing the house. All of the officers were armed. Gibson and Proctor were in uniform. Stanley, Kenslow, Walker and Aug were dressed in civilian clothes, but each was wearing a tactical vest that identified him as a law enforcement officer.[2] The officers engaged in surveillance of the premises until Defendant arrived. Once that occurred, they converged on the house. Stanley, Proctor, Aug and Walker entered the front yard and immediately

---

1. References to statutes are to RSMo Cum. Supp. (2004) unless otherwise indicated.

2. Stanley's vest bore a sheriff's badge, and the word "SHERIFF" was printed on the back in letters three inches high. The vests worn by Kenslow, Walker and Aug had the word "POLICE" written in white letters four inches high on the front and the words "POLICE U.S. MARSHAL" on the back.

restrained four individuals located there by making them lie down on the ground.

Kenslow was the first officer to run to the back of the house. When he arrived in the back yard, he saw Defendant standing between the back of a pickup truck and a privacy fence. Kenslow drew his sidearm and held it in his right hand with the muzzle pointing downward. Defendant saw Kenslow and began to run away with Kenslow in pursuit. Defendant then stopped, turned around and said "Oh no, you don't" or "Oh no, you won't." Raising his right arm to strike, he charged directly at Kenslow. The officer tried to block the blow using his left arm while continuing to hold his gun, muzzle downward, in his right hand. The attempted parry was unsuccessful, and Defendant hit Kenslow's left arm and the side of his head. The impact knocked off Kenslow's eyeglasses. He responded by using both arms to grab Defendant around the chest in a "bear hug." Defendant's right arm was free, and he used his fist and elbow to repeatedly strike Kenslow in the head and shoulder. Kenslow held his gun away from Defendant and tried to reholster the weapon while maintaining a hold on Defendant. While pummeling Kenslow, Defendant dragged the officer toward the privacy fence. At some point, Kenslow lost his gun. As he was beaten, his grip on Defendant got lower, and he wound up holding onto Defendant's legs.

When Kenslow first entered the back yard, Gibson was about twenty to thirty yards away. He heard someone in the back repeatedly shouting for help. Upon entering the back yard, Gibson saw Kenslow fighting with Defendant and holding him around the waist in a frontal bear hug. Defendant's arms were free, and he was using both fists to repeatedly and violently punch Kenslow in the head and upper shoulders. As Defendant beat Kenslow,

his grip slid down Defendant's body to around the knees and his legs flailed out behind him. Defendant dragged Kenslow across the ground toward a break in the privacy fence surrounding the back yard. Since Gibson did not see a weapon in either man's hands, he set his shotgun aside and drew his taser. By that time, Proctor, Walker and Aug had come into the back yard and also were observing the altercation between Defendant and Kenslow.

As Gibson moved toward Defendant with the taser, Defendant reached inside his shirt and pulled out a large knife from the small of his back. Defendant initially pointed the blade downward at Kenslow, and Aug was afraid Defendant was going to stab Kenslow. Instead, Defendant looked up and saw Gibson. Defendant then turned the knife around so that he was holding it by the blade, drew it back and threw it "very hard" in an overhand motion directly at Gibson's face. Gibson, who was about seven feet away, ducked and moved slightly to his left. The knife whistled over his right shoulder just inches from his ear and struck a wooden playground set behind him. After Defendant threw the knife, he was able to get his left leg free of Kenslow's grasp. Defendant had turned and appeared ready to break free and run when Gibson fired the taser. The device incapacitated Defendant and caused him to stop resisting arrest. Aug held Defendant's hands so handcuffs could be applied and heard him say "he would rather be shot or killed than go to jail."

Kenslow was sitting on the ground with a dazed expression on his face. He had been struck with great force several times in the head and neck. His eyes were unfocused, and he was very disoriented. He appeared confused and responded inappropriately when questioned. His gun was lying on the ground about five or six

feet behind him. He was taken to the hospital and diagnosed as having an acute head injury and a possible concussion.

At trial, the State called Stanley, Gibson, Kenslow, Proctor, Walker and Aug as witnesses. During Gibson's testimony, the court admitted Exhibit 11 in evidence. This exhibit was a large, non-scale diagram of the premises where Defendant was captured. Each officer used the diagram to help the jury understand what had happened and to record the approximate locations where particular events occurred. During Gibson's testimony, he marked the locations where: (1) he first saw Defendant and Kenslow fighting; (2) Kenslow's weapon was found; and (3) Defendant and Kenslow fell to the ground.

Defendant did not testify at trial. His theory of defense was elicited via cross-examination of the State's witnesses and through the testimony of one witness he called in his case. During the State's case, Defendant's attorney cross-examined Stanley about a statement Defendant made after he was captured. Stanley was the officer who gave Defendant his *Miranda* warning before he was taken to jail.[3] According to Stanley, Defendant said he did not want to hurt the officers; he just wanted to get shot. Stanley had Defendant placed on suicide watch at the jail. Defendant also cross-examined Kenslow about the appearance of his clothing and the absence of any announcement by him that he was a police officer before the affray began. During Defendant's case, he called an acquaintance, Terri Reaves. She testified that on the day of the incident, Defendant told her he would do whatever he had to do to make the police shoot him. He kissed Reaves good-bye and said this was the last time she would see him alive.

When the case was submitted, the jury was instructed on three charges. Instruction No. 5 submitted assault of a law enforcement officer in the first degree for attempting to kill or cause serious physical injury to Gibson by throwing a knife at him. Instruction No. 7 submitted the lesser-included offense of assault of a law enforcement officer in the second degree for purposely placing Gibson in apprehension of immediate serious physical injury by throwing a knife in his direction. Instruction No. 8 submitted assault of a law enforcement officer in the second degree of knowingly causing physical injury to Kenslow by hitting him in the head.

During Defendant's closing argument, his attorney argued for an acquittal on Count II because the evidence did not prove that Defendant knew Kenslow was a police officer. As to Count I, defense counsel conceded that the jury would convict Defendant. The only issue was Defendant's intent, which would determine whether he was guilty of the greater or lesser offense. Counsel argued that Defendant was just trying to get shot; he did not intend to kill or cause serious physical injury to the officers:

> Once he reaches—once he gets to Agent Kenslow, does he try to grab his gun, try to reach for his sidearm? Nobody testified that they saw him make any kind of actions like that. Once again, if you're looking to kill or seriously physically injure a police officer, why not try to grab at his gun or his sidearm and try to get it away from him. He didn't do that.

During the prosecutor's rebuttal argument, she responded to this assertion in the following manner:

> Why didn't he go after the gun? I'll tell you why he didn't go after the gun when

**3.** See *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

he first had a chance to do that, because when he hit Kenslow, that gun went flying off to the right. You look at [Exhibit 11] where that gun was, it was right where it would go right on the diagram here.

[Defense counsel]: I'm going to object. Judge, I think she's misstating the evidence. Kenslow said that he held on to the gun after he was hit.

THE COURT: Jury will recall what the evidence was. This is not evidence, this is argument.

[Prosecutor]: Kenslow can't remember a lot of things. I mean, this poor man really got pummeled to within an inch of his life, okay? He's being hit and that gun goes flying and you look at [Exhibit 11] and that's right where the gun would be if that's what happened. So he's actually lost that gun.

On Count I, the jury found Defendant guilty of assault of a law enforcement officer in the first degree as submitted in Instruction No. 5. On Count II, the jury found Defendant guilty of assault of a law enforcement officer as submitted in Instruction No. 8. The Court imposed consecutive sentences of 25 years imprisonment and 10 years imprisonment, respectively, on those two counts. This appeal followed.

## II. Standard of Review

In Defendant's sole point on appeal, he contends the trial court erred in failing to sustain his objection to the prosecutor's rebuttal argument because she misstated the evidence. Defendant argues that the applicable standard of review is for abuse of discretion. We disagree. When defense counsel made his objection, the judge told the jurors to recall the evidence and reminded them that the prosecutor's argument was not evidence. Defense counsel did not object to that reme-

dy. Therefore, we may only review for plain error. *State v. Middleton,* 995 S.W.2d 443, 456 (Mo. banc 1999).

Plain error review involves a two-step process. *State v. Stallings,* 158 S.W.3d 310, 315 (Mo.App.2005). First, we determine whether the claim of error facially establishes substantial grounds for believing that manifest injustice or miscarriage of justice has resulted. *Id.* "Plain errors are evident, obvious, and clear, and we determine whether such errors exist based on the facts and circumstances of each case." *State v. Johnson,* 182 S.W.3d 667, 670 (Mo.App.2005). Absent a finding of facial error, this Court should decline its discretion to review the claim. *Stallings,* 158 S.W.3d at 315. "If plain error is found, we proceed to the second step to consider whether the error actually resulted in manifest injustice or a miscarriage of justice." *Id.* at 315–16.

"To reverse a conviction under plain error review on a claim of improper closing argument, a defendant must establish not only that the argument was improper, but that it had a decisive effect on the outcome of the trial and would amount to a manifest injustice or miscarriage of justice if the error were left uncorrected." *State v. Tabor,* 193 S.W.3d 873, 878 (Mo. App.2006). It is the defendant's burden to demonstrate the decisive effect of the erroneous argument. *State v. O'Haver,* 33 S.W.3d 555, 561 (Mo.App.2000).

## III. Discussion and Decision

Defendant's sole point on appeal is directed toward the prosecutor's rebuttal argument. It is appropriate to note that "a prosecutor is permitted to comment on and make reasonable inferences from the evidence." *State v. Edwards,* 116 S.W.3d 511, 547 (Mo. banc 2003). "That includes pointing out to the jury an ab-

sence of evidence to support a theory suggested by the defendant." *State v. Mease,* 842 S.W.2d 98, 110 (Mo. banc 1992). "Counsel may even belittle and point to the improbability and untruthfulness of specific evidence." *State v. Kreutzer,* 928 S.W.2d 854, 872 (Mo. banc 1996). The prosecutor is also entitled to rebut and answer the arguments of the defense. *Tisius v. State,* 183 S.W.3d 207, 218 (Mo. banc 2006); *State v. Kenley,* 952 S.W.2d 250, 273 (Mo. banc 1997); *State v. Hale,* 371 S.W.2d 249, 256 (Mo.1963). Because only plain error review is available, our first task is to determine whether Defendant's claim of error facially establishes substantial grounds for believing that a manifest injustice or miscarriage of justice has resulted. *State v. Stallings,* 158 S.W.3d 310, 315 (Mo.App.2005).

Defendant contends that he was prejudiced by the prosecutor's rebuttal argument because her comments denigrated the defense that Defendant did not intend to hurt the law enforcement officers. Specifically, Defendant argues the prosecutor misstated the evidence when she said that the reason Defendant did not go for Kenslow's gun "was because it had been knocked out of his hand when [Defendant] first struck him...." We do not accept this as an accurate characterization of the prosecutor's argument. What she actually said was that Defendant "didn't go after the gun when he first had a chance to do that" because Kenslow no longer had the gun. We do not interpret the prosecutor's argument to mean that Kenslow dropped his gun at Defendant's first blow. Instead, we interpret the argument to mean that, by the time Defendant was first in a position to grab at the gun, Kenslow had already dropped it. We believe this argument was a reasonable inference for the jury to draw from the evidence.

When Kenslow first gripped Defendant in a bear hug, the two were facing one another. Only Defendant's right arm was free. Kenslow purposely held his gun away from Defendant to keep it out of his reach. Given Kenslow's chest-high bear hug on Defendant that pinned his left arm, holding the gun somewhere on the left side of Defendant's body would place the weapon well out of reach of his right hand. Moreover, Defendant immediately started using that hand to beat Kenslow about the head and upper shoulders. Kenslow acknowledged that he lost his gun while he was being pummeled by Defendant. Gibson was the second officer to get to the back yard, and he was only 20 to 30 yards behind Kenslow. When Gibson first saw Kenslow, he had already lost his gun. During Gibson's testimony, he marked on Exhibit 11 to show the jury the locations where the melee started, where it ended and where Kenslow's gun was found. The prosecutor used this exhibit to support her argument. Based on the record before us, we conclude that Defendant has failed to establish any error, plain or otherwise, in the prosecutor's rebuttal argument.[4] Con-

---

4. The authorities cited by Defendant do not support his assertion that the prosecutor's rebuttal argument was erroneous. *State v. Nelson,* 957 S.W.2d 327 (Mo.App.1997), and *State v. Bearden,* 748 S.W.2d 753 (Mo.App. 1988), both involved improper arguments concerning matters outside the scope of the evidence admitted at trial. *See Nelson,* 957 S.W.2d at 329–30 (prosecutor's argument improperly contained a clear reference to a statement made by defendant which was not admitted into evidence at the State's request); *Bearden,* 748 S.W.2d at 755 (prosecutor's argument improperly referred to informant telephone calls which were not admitted in evidence and to testimony that would have been given by other police officers not called to testify). *Bearden* is further distinguishable because the trial court compounded the prosecutor's mistake by improperly telling the jury that the testimony from all of the other police officers would have been favorable to the

sequently, we decline to review Defendant's point on appeal.

 While the foregoing discussion disposes of the issue presented by Defendant's appeal, there is a matter which requires further attention. The judgment contained in the record on appeal contains two clerical errors. First, the judgment incorrectly recites that Defendant's conviction on Count II for second degree assault of a law enforcement officer was a class D felony. The second amended information in the legal file reflects that Defendant was charged with knowingly causing physical injury to Kenslow by striking him in the head. *See* § 565.082.1(2). The information correctly described this alleged offense as a class C felony. *See* § 565.082.3. Moreover, the trial court correctly noted at the sentencing hearing that Defendant's conviction on Count II was a class C felony. Second, the judgment recites that Defendant was not charged as a prior and persistent offender. Our review of the transcript, however, reveals that he was so charged in the second amended information. Thereafter, the judge expressly found at a pretrial hearing that Defendant was a prior and persistent offender beyond a reasonable doubt. The docket entry memorializing the rulings made on that date contains the same finding. Defendant's sentence of ten years on Count I could not have been imposed if he had actually been convicted of an unenhanced class D felony. *See* § 558.011.1(4) (maximum sentence for a class D felony is four years). A ten-year sentence is within the permissible 5–15 year range for an enhanced class C felony conviction. *See* § 558.016.7(3) (a persistent offender convicted of a class C felony may be given any sentence authorized for a class B felony); § 558.011.1(2) (the au-

thorized term of imprisonment for a class B felony is 5–15 years). Such enhanced punishment was authorized by the trial court's pretrial finding that Defendant was a prior and persistent offender, even though the court did not reiterate that finding during the oral pronouncement of sentence at the sentencing hearing. *See* § 558.021 RSMo (2000); § 558.016; *State v. Hughes,* 944 S.W.2d 247, 248 (Mo.App. 1997).

"The failure to memorialize accurately the decision of the trial court as it was announced in open court was clearly a clerical error." *State v. Taylor,* 123 S.W.3d 924, 931 (Mo.App.2004). Rule 29.12 authorizes a trial court to correct clerical errors in a judgment resulting from oversight or omission. *State v. Dillard,* 158 S.W.3d 291, 305 (Mo.App.2005). Accordingly, while we affirm Defendant's convictions and sentences, we must remand this case with instructions to the trial court to enter an amended written judgment reflecting that: (1) Defendant was found to be a prior and persistent offender; and (2) his conviction on Count II of the second amended information constituted a class C felony.

BARNEY and GARRISON, JJ., concur.

State. *Bearden,* 748 S.W.2d at 756. In the case at bar, the court simply asked the jury to

recall the evidence.