

# In the Missouri Court of Appeals
# Eastern District

## DIVISION THREE

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED102951 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of the City of St. Louis |
| vs. | ) | |
| | ) | |
| RICHARD REYNOLDS, | ) | Hon. Michael F. Stelzer |
| | ) | |
| Appellant. | ) | Filed: September 20, 2016 |

## INTRODUCTION

Richard Reynolds appeals from the jury verdict convicting him of first degree murder, first degree assault, two counts of armed criminal action, and unlawful use of a weapon. We affirm the judgment.

## FACTUAL AND PROCEDURAL HISTORY

The facts, which this court reviews in the light most favorable to the verdict, indicate that in July of 2012, Richard Reynolds ("Reynolds" or "Appellant") and three other individuals fired into a car occupied by A.B. and his girlfriend, A.C.[1] A.B. was in the driver's seat while A.C. was in the front passenger seat. Reynolds came out from a gangway between two houses armed with a gun, ran up to the car, pointed the gun at A.B., and opened fire. When A.B. attempted to drive away, two of the other individuals with Reynolds also started shooting at the car. At least 3

---

[1] The actual names of the victims are not being used in order to protect their identities.

bullets struck the vehicle. A.B. drove away. When he got to his home, A.C. told him she had been shot. A.B. then drove his girlfriend to Barnes Hospital. A.C. died four days later from a gunshot wound to the head. The bullet that killed her entered through her left cheek, travelled through her skull, and lodged underneath the base of her skull in the spinal column of her neck.

Reynolds was indicted on five counts: Count I, murder in the first degree for the death of A.C., in violation of RSMo § 565.020 (2000)[2]; Count II, armed criminal action predicated on the murder in Count I, in violation of section 571.015; Count III, assault in the first degree for shooting at A.B., in violation of section 565.050; Count IV, armed criminal action predicated on the assault in Count III, in violation of section 571.015, and; Count V, unlawful use of a weapon for discharging a firearm at a motor vehicle which resulted in death, in violation of section 571.030.1(9) as enhanced by section 571.030.7.

The case proceeded to trial. During voir dire, the court spoke with two female venirepersons, Juror #1706 and Juror #1429, outside the presence of the venire panel regarding complaints they filed against the court's bailiff.[3] First, the court called in Juror #1706. After confirming that she filed a complaint, the court stated: "So to be perfectly honest, I don't see how I would have you on this jury given the fact that you filed a complaint against him, and that has nothing to do -- I'm not commenting on the merits of it. That's not the point. My point is that that can create a problem. So I'm going to tell you now, just don't answer any questions [during the jury selection process]. You're going to have to sit here through the rest of the process. Do not raise your hand. Do not answer any questions, okay?" Juror #1706 responded that she understood and had no questions.

---

[2] All statutory references are to RSMo 2010 unless otherwise indicated.
[3] The record does not indicate the basis for the complaint.

2

Next, the court called in Juror #1429 and stated: "It has come to my attention that you have filed a complaint against my bailiff in this division; is that correct?" When Juror #1429 confirmed that this was correct, the court added: "All right, and I'm not here to comment on the merits of it or anything like that, but I think you can see the obvious problem that this creates for the Court. If you were to be selected for this jury you would be interacting with him on a regular basis for the next several days, and my concern is in any case, but especially in a case of this magnitude and seriousness, that that could cause a distraction for you and the bailiff, and that would not be fair to the parties quite frankly. So I don't see any way that you are going to make it on to this jury. Having said that you are going to have to sit here throughout the remainder of the questions. I do not want you to raise your hand. I do not what [sic] you to answer any questions. Is that understood?" Juror #1429 responded that she understood and had no questions.

After completion of voir dire and while the trial court was ruling on challenges for cause, the court on its own motion struck both Juror #1706 and Juror #1429 from the venire panel. No further explanation was given by the court. Neither party raised any objection.

Also during the jury selection process, the State used a peremptory strike to dismiss Juror #518, an African American male, from the venire panel. The defense immediately raised a *Batson* objection, alleging that the prosecution's use of a peremptory strike on Juror #518 was an "improper attempt to exclude him on the basis of his race, in violation of his rights and of [the Defendant's] rights to due process and protection under the law." Defense counsel asked the court to "take judicial notice that [Juror #518] is an African-American male, and the only African-American male left on the panel."

The State offered the following race-neutral reason for striking the juror:

"When [Juror #518] was called upon his answers were curt. His facial expression was completely disinterested and sort of unresponsive. He mumbled his first few answers

3

until he was instructed to speak up, and that generally makes me nervous. And you can see that if you flip back to page 1. [Juror #1429] who is a white female gave similar sort of responses. She only spoke when called upon. She gave short curt answers. She seemed generally disinterested during most of jury selection. Both when I watched these two people when I spoke, and then even when Ms. Johnson spoke, I kept an eye on all of these people who I was worried about, and so I struck a white female who did the exact same thing as a black male, so the opposite sex and an opposite race."

The defense objected to the use of Juror #1429 as a similarly situated white juror and argued that the State's proffered reason was pretextual, stating:

"I don't believe the record supports the state's explanations especially for the demeanor explanation. I didn't see it, and the state didn't inject it into the record or question the juror about it. Additionally, there were other white males who were not struck who gave short answers. [Venireperson P], also located on page 5 line 5, he only answered the questions when called upon. It does not mean he is a disinterested juror. [Juror #518] did not say anything that would make him a bad juror for the state. Additionally, when he was asked about the question regarding cool reflection he responded to Ms. Benniger. He didn't ignore her comments. When I asked him, 'Can you presume [the Defendant] innocent,' he said, 'yes.' 'Could you hold the state to their burden?' 'Yes.' 'Can you listen and make a determination about witness credibility?' 'Yes.' So based on that and based on the fact that there are similarly situated white males I believe this is a pretextual decision."

The Court overruled Reynolds' *Batson* objection, stating: "[Juror #518] did, [sic] I will agree with the state, insofar as the description of his demeanor and his answers. I also would agree that the white female who was struck was similar. I did note that she, once brought to my attention by the state, that she gave similar types of answers to these questions, and so I don't find this to be pretextual. I'm going to deny the Batson Challenge." The court then dismissed Juror #518, the jury was empaneled, and the case proceeded to trial.

After trial, the jury convicted Reynolds on all five counts. The trial court sentenced Reynolds to life in prison without parole Count I, 10 years in prison on Count II, 15 years in prison on Count III, 10 years in prison on Count IV, and 30 years in prison on Count V. All sentences were concurrent.

4

Reynolds filed a motion for judgment of acquittal notwithstanding the verdict or a new trial. The motion alleged that the trial court erred in overruling Reynolds' *Batson* objection to the dismissal of Juror #518, alleging that the prosecution's peremptory strike was race-based and the proffered reason was pretextual. Reynolds did not raise any objections concerning either the dismissal of Jurors #1706 and #1429 from the venire panel or the constitutionality of the multiple convictions based on the same conduct.

## POINTS ON APPEAL

Reynolds raises three points on appeal. He argues that the trial court: (1) plainly erred in allowing convictions for both armed criminal action and unlawful use of a weapon as they constitute cumulative punishment in violation of his right to be free from double jeopardy; (2) plainly erred in dismissing two female jurors from the venire panel in violation of his rights to due process and a fair trial by an impartial jury; and (3) clearly erred in overruling his *Batson* objection to the prosecutor's peremptory strike of an African-American male juror from the venire panel. Reynolds does not challenge the sufficiency of the evidence.

## DISCUSSION

### I.      Point One – Double Jeopardy

For his first point on appeal, Reynolds argues that the trial court plainly erred when it allowed convictions for both armed criminal action and unlawful use of a weapon because these dual convictions based on the same course of conduct violated his right against double jeopardy as guaranteed by the Fifth Amendment to the United States Constitution.[4] We disagree.

---

[4] Reynolds' first point relied on also states that his rights were violated under the due process clause of the United States Constitution, the Sixth Amendment, the Eighth Amendment, and Article I, §§ 10 and 18(a) of the Missouri Constitution. However, he provides no legal support for these arguments and focuses solely on double jeopardy. Accordingly, all arguments not based on the double jeopardy clause of the Fifth Amendment of the United States Constitution have not been properly preserved for appellate review, and are summarily rejected. *See Thummel v. King*, 570 S.W.2d 679, 687 (Mo. banc 1978). It should be noted, however, that the Supreme Court of Missouri has

5

A.      Standard of Review

Reynolds concedes that he failed to raise this argument to the trial court and requests plain error review under Rule 30.20. To preserve a constitutional issue for appellate review, it must be raised at the earliest opportunity consistent with good pleading and orderly procedure, and must be properly preserved throughout the proceeding, or this court's analysis is limited to plain error review. *State v. Wickizer*, 583 S.W.2d 519, 523 (Mo. banc 1979); *State v. Baxter*, 204 S.W.3d 650, 652 (Mo. banc 2006).

Plain error review under Rule 30.20 is discretionary and involves a two-step process. *State v. Stallings*, 158 S.W.3d 310, 315-316 (Mo. App. W.D. 2005). First, we determine whether the claim of error facially establishes substantial grounds for believing that manifest injustice or a miscarriage of justice has resulted. *Id*. Unless the error is obvious, evident, and clear from the face of the claim, the appellate court should exercise its discretion and decline to review the claim. *Id*. If plain error is found, then the appellate court may proceed to the second step, whether the error actually resulted in manifest injustice or a miscarriage of justice. *Id*. In order to demonstrate that a manifest injustice has affected his or her substantial rights, the appellant "must go beyond a mere showing of demonstrable prejudice." *State v. Parker*, 856 S.W.2d 331, 332 (Mo. banc 1993). The plain error rule should be used sparingly and will not justify review of every point that has not been preserved for appellate review. *State v. Tokar*, 918 S.W.2d 753, 769 (Mo. banc 1996).

When a criminal defendant alleges that his conviction violates the double jeopardy clause of the Fifth Amendment, and that allegation is determinable "from the face of the record," the defendant is entitled to plain error review. *State v. Liberty*, 370 S.W.3d 537, 546 (Mo. Banc

declined to construe the double jeopardy provisions of the Missouri constitution differently than the United States Constitution. *See* 32 Robert H. Dierker, Missouri Practice Series § 42.2 (2d ed. 2004) (text accompanying note 4).

2012) (internal quotes omitted). In such cases, review is generally granted because "the right to be free from double jeopardy is a constitutional right that goes 'to the very power of the State to bring the defendant into court to answer for the charge brought against him.'" *Id.* (quoting *Blackledge v. Perry*, 417 U.S. 21, 30 (1974)). Whether a defendant's right against double jeopardy has been violated is a question of law which we review *de novo*. *Yates v. State*, 158 S.W.3d 798, 801 (Mo. App. E.D. 2005).

B.     Analysis

A criminal defendant's right to be free from double jeopardy is derived from the Fifth Amendment of the United States Constitution and applies to the states through the Fourteenth Amendment. U.S. Const. amends. V and XIV; *State v. Horton*, 325 S.W.3d 474, 476 (Mo. App. E.D. 2010). The double jeopardy clause protects a criminal defendant from being subjected to multiple prosecutions for the same offense as well as from cumulative punishments for the same conduct imposed in a single trial when they result in a greater punishment than the legislature intended. *Missouri v. Hunter*, 459 U.S. 359, 365-66 (1983). Cumulative punishments do not violate double jeopardy if the legislature intend to allow cumulative punishments or if the offenses are not the "same offense" under the *Blockburger* test. *See State v. Blackman*, 968 S.W.2d 138, 140 (Mo. banc 1998) (citing *Hunter*, 459 U.S. at 367-68). Separate convictions are not considered the "same offense" when each offense requires proof of a fact that the other does not. *Liberty*, 370 S.W.3d at 546); *Bates v. State*, 421 S.W.3d 547 (Mo. App. E.D. 2014). The "same element" test has been codified in Missouri law under RSMo §§ 556.041 and 556.046.1(1). *Bates*, 421 S.W.3d at 551.

When the offenses involved are not the same and the only question is whether separate punishments are improperly cumulative, the central issue is whether the legislature intended to

allow separate convictions with cumulative punishments. *State ex rel. Green v. Moore*, 131

S.W.3d 803, 806 (Mo. banc 2004); *see also Blackman*, 968 S.W.2d at 140 ("a court should apply

the *Blockburger* test only when there is no clear legislative intent as to whether successive

punishment should be imposed"). If the legislature authorizes cumulative punishment under two

statutes that prohibit the same conduct, the trial court may properly impose multiple punishments

without violating the double jeopardy clause. *State v. McTush*, 827 S.W.2d 184, 186 (Mo. banc

1992). Multiple charges do not violate double jeopardy if the defendant has "in law and in fact

committed separate crimes." *State v. Jackson*, 703 S.W.2d 30, 33 (Mo. App. E.D. 1985)

(affirming dual convictions "where two separate offenses arise out of the same set of facts").

In this case, the two convictions Reynolds claims violate double jeopardy by imposing

cumulative punishments are Count IV, armed criminal action ("ACA") for committing an assault

while armed with a deadly weapon in violation of 571.015, and Count V, unlawful use of a

weapon ("UUW") for discharging a firearm at a vehicle in violation of section 571.030.1(9).[5]

Reynolds does not claim these convictions are the "same offense" under the *Blockburger* test,

thus the only question is whether the legislature intended these offenses to impose cumulative

punishments.

We find that the legislature did intend these offenses to impose cumulative punishments.

One of the essential elements of a conviction for ACA is conviction of an underlying predicate

felony. This means that the legislature necessarily intended punishment to be cumulative with the

predicate felony. *Blackman*, 968 S.W.2d at 140 ("Because this statute expressly states

---

[5] Reynolds also argues that his conviction on Count V could have been based on two other sections of the UUW statute because the jury instructions "could match 571.030 subsections 3, 7, or 9." However, it is clear from the record that the jury instructions on Count V were consistent with the indictment, which was based on sections 571.030.1(9), discharging a firearm at a motor vehicle as enhanced by 571.030.7, because the violation resulted in serious injury or death. Therefore, our analysis only considers the UUW offense under section 571.030.1(9).

8

punishment for armed criminal action is 'in addition to' other punishment defendant may receive for the felony committed, it clearly establishes the legislature's intent to provide for successive punishment for those crimes"). Courts have also consistently found that the legislature intended cumulative punishment for ACA and any other crime so long as it is not one of the four crimes the statute expressly states cannot serve as a predicate offense. *See, e.g. State v. Prince*, 311 S.W.3d 327 (Mo. App. W.D. 2010), *Brown v. State*, 343 S.W.3d 760 (Mo. App. E.D. 2011), *State v. White*, 458 S.W.3d 337 (Mo. App. S.D. 2015). Offenses that qualify as a predicate for an ACA conviction include "any felony under the laws of this state" except for four offenses that are expressly listed as exceptions prohibiting their use as a predicate for armed criminal action ("ACA exceptions"). RSMo § 571.015.4.

Thus, in this case, the only question is whether unlawful use of a weapon for firing at a vehicle is one of the four ACA exceptions. This inquiry is complicated by the fact that the legislature listed the ACA exceptions by referencing the specific section of the code where the offenses were defined at the time the ACA was enacted in 1977. *See* RSMo § 571.015.4 (1969), *Ex rel. Green v. Moore*, 131 S.W.3d at 807 (reviewing the legislative history of the ACA statute and the ACA exceptions). However, the legislature has since repealed each of those four offenses, reenacted them in other sections of the code, and combined them with other offenses. *Ex rel. Green*, 131 S.W.3d at 808. Although the legislature has never amended the ACA statute to reflect these changes in the law, courts have followed the ACA exceptions to their new homes, holding that the legislature did not intend to eliminate these exceptions by moving the location of the offenses they refer to. *Id*. ("the renumbering and recodification of the statutory sections listed in section 571.015.4, while confusing, are of no effect in determining whether double jeopardy

9

applies to [appellant's] conviction of armed criminal action and that [sic] unlawful use of a weapon").

Therefore, the inquiry becomes whether Reynolds' specific UUW conviction, for discharging a firearm at a vehicle in violation of section 571.030.1(9), is merely a reenactment of one of the four original ACA exceptions. We find that it is not.

The ACA exceptions are listed in subsection 4 of the armed criminal action statute. *See* RSMo § 571.015.4.[6] Courts have considered each UUW offense on a case-by-case basis to determine whether it constitutes a reenactment of one of the original ACA exceptions. *See*, *e.g.*, *Ex rel. Green*, 131 S.W.3d at 803 (UUW section 571.030.1(4) is a reenactment of section 564.610, exhibiting a firearm in a threatening manner); *State v. Couts*, 133 S.W.3d 52, 56 (Mo. banc 2004) (UUW section 571.030.1(3) for shooting into a dwelling is not a reenactment of any 564 exception and may serve as a predicate for ACA). None of the original ACA exceptions involved the act of discharging a firearm.[7] To date, neither the Supreme Court of Missouri nor any district of the appellate court has held that an offense involving the discharging of a firearm is a reenactment of any of the original ACA exceptions. We decline to do so today.

In this case, an essential element of Reynolds' UUW conviction is discharging a firearm. This makes the offense fundamentally different from any of the offenses listed as exceptions to

---

[6] Offenses that cannot serve as a predicate for armed criminal action are "sections 564.590, 564.610, 564.620, 564.630." Section 564.640 is also listed, but this section merely prescribed penalties rather than defining a new offense.

[7] *See* RSMo § 564.590 (1978) (prohibiting the sale, delivery, transport, possession, or control of any machine gun); RSMo § 564.610 (1978) (prohibiting (i) the concealed carry of a dangerous or deadly weapon in any church, place of worship, school, place of public assembly, election precinct, courtroom except for militia drills or weapons training, (ii) the exhibition of a dangerous weapon in the presence of one or more persons in an angry, rude, or threatening manner or while intoxicated, and (iii) sale of weapons to minors); RSMo § 564.620 (1978) (prohibiting the possession by a dealer of any firearm held for sale which is able to be concealed and not plainly marked with the trademark of the manufacturer and the serial number); RSMo § 564.630 (1978) (prohibiting the lease, purchase, procurement, or possession of any firearm which is capable of being concealed and is not plainly marked pursuant to RSMo § 564.620); RSMo § 564.640 (1978) (denominating the offenses of this subsection as felonies and prescribing penalties).

the ACA statute. Therefore, we find that UUW for discharging a firearm at a vehicle is not one of the exceptions to the ACA statute.

Moreover, courts have already held the offense of UUW for discharging a firearm *from* a motor vehicle is not a reenactment of one of the ACA exceptions, and therefore there is no violation of double jeopardy for separate convictions and punishments for armed criminal action and discharging a firearm from a vehicle. *Prince*, 311 S.W.3d at 327 (holding that UUW section 571.030.1(9) for shooting from a motor vehicle may serve as a predicate for ACA because it is not a reenactment of any of the original ACA exceptions). Although Reynolds was convicted of discharging a firearm *at* a vehicle, this distinction is slight. It is also irrelevant since both offenses require discharging a firearm, which was not a requirement of any of the original offenses listed as exceptions to the ACA statute.

Reynolds argues, in the alternative, that every UUW offense in section 571.030 "should be categorically excluded as an underlying offense for armed criminal action" because this is what the legislature intended when it consolidated the original ACA exceptions with other weapons offenses under the UUW statute without amending the ACA statute. However, in *State v. Couts*, the Supreme Court of Missouri expressly rejected the argument that this legislative act requires the court to "bar all types of unlawful uses of a weapon from forming the predicate for armed criminal action." *Couts*, 133 S.W.3d at 56 (holding that unlawful use of a weapon for discharging a firearm at a dwelling in violation of section 571.030.1(3) is not one of the original ACA exceptions). The court acknowledged that, although "it would be simpler to apply section 571.015.4's prohibitions if they applied to all forms of unlawful use of a weapon, that is a matter for the legislature, not for this Court." *Id.*; s*ee also Prince*, 311 S.W.3d at 327 (holding that unlawful use of a weapon for firing from a vehicle in violation of section 571.030.1(9) is not not

11

one of the original ACA exceptions and can serve as a predicate offense for ACA without violating double jeopardy); *Brown*, 343 S.W.3d at 760 (accord); *White*, 458 S.W.3d at 337 (accord).

We find the trial court did not plainly err by allowing convictions for both armed criminal action in violation of 571.015 and unlawful use of a weapon based on discharging a firearm at a vehicle in violation of section 571.030.1(9). Reynolds suffered no manifest injustice because his dual convictions for these crimes do not constitute cumulative punishment in violation of the double jeopardy clause. Point denied.

## II. Point Two – Right to Fair and Impartial Jury Trial

For his second point on appeal, Reynolds argues the trial court plainly erred during jury selection by dismissing two female venirepersons after they filed complaints against the bailiff and allowing the bailiff to remain in charge of the remaining jurors because this violated his rights to due process and a fair trial by an impartial jury.

### A. Standard of Review

Reynolds concedes this issue was not preserved for appeal and that it is reviewable only for plain error. Because this is an unpreserved constitutional issue, the standard of review is the same as in point one.

### B. Analysis

Reynolds argues that the trial court's decision to dismiss the jurors and retain the bailiff prejudiced him because "a bailiff has considerable control over the jury" and "using a bailiff in appropriately [sic] can result in prejudice." He further argues that the presence of the bailiff "create[d] a force against true fair deliberation and instead pressure[d] the jury to return a verdict quickly, lest they be left in the care of someone who already generated two complaints for

12

inappropriate behavior." This point raises two distinct issues relating to the fairness of the trial. First, whether the dismissal of the two female venirepersons violated Reynolds' right to a fair and impartial jury. Second, whether the continued service of the bailiff tainted the jury verdict.

We find that Reynolds' claim fails to establish substantial grounds for believing that manifest injustice or a miscarriage of justice has resulted. We therefore exercise our discretion to decline reviewing the merits of this claim. *See Stallings*, 158 S.W.3d at 315-316.

As to the first issue, Reynolds suffered no manifest injustice from the dismissal of the two female jurors because there is no indication that the empaneled jury was not impartial. *See State v. Weekley*, 621 S.W.2d 256, 258 (Mo. banc 1981) (when a juror is dismissed for cause, "an appellant is not entitled to relief unless he can show the jury finally empaneled was not impartial"). Reynolds has offered no evidence that the jury that decided his case was unfair or partial. Therefore, he has failed to establish that any injustice resulted from the dismissal of these two jurors from this panel that decided his case.

As to the second issue, Reynolds has not demonstrated that he suffered any manifest injustice due to the continued service of the bailiff during his trial. Reynolds' argument that the bailiff's presence tainted the jury verdict is bare speculation unsupported by any fact in the record.[8] This showing is insufficient to merit plain error review. *See Stallings*, 158 S.W.3d at 315-316 (plain error must be "evident, obvious, and clear").

Contrary to Reynolds' argument, the record indicates that the trial court was attempting to preserve the integrity of the jury when it decided it was necessary to dismiss the jurors who had filed complaints against his bailiff. This decision was made outside of the presence of the

---

[8] The record contains no indication of the nature of the complaints filed against the bailiff. While the court had previously instructed one of the women involved to stop taking notes during voir dire and to turn over to the bailiff any pages from her notebook that contained notes, it is unclear whether this incident is related to the women's subsequent complaint against the bailiff.

13

other jurors. The court also made it clear that dismissing the jurors had nothing to do with the merits of their complaint, explaining that its purpose was to protect the fairness of the proceeding and prevent any prejudice to the parties. This decision was within the trial court's considerable discretion to determine how to preserve the trial's "sense or appearance of neutrality." *See Johnson v. State*, 406 S.W.3d 892, 903 (Mo. banc 2013) ("A trial court has wide discretion in determining whether to take action to avoid an environment for trial in which there is not a 'sense or appearance of neutrality.'"). The judge was appropriately concerned that issues relating to the complaint would distract both the jurors and the bailiff, and the judge was in the best position to determine whether the incident had a prejudicial effect on the jury. *See State v. Hartman*, 479 S.W.3d 692, 698 (Mo. App. W.D. 2015).

We decline plain error review because Reynolds' claim fails to establish substantial grounds for believing that the trial court's decision to dismiss two female jurors from the venire panel resulted in manifest injustice or miscarriage of justice. Point denied.

## III. Point Three – Batson Objection

For his third point on appeal, Reynolds argues that the trial court erred when it overruled Reynolds' *Batson* objection to the State's peremptory strike of an African American venireperson because the strike was race-based in violation of the Fourteenth Amendment.

### A. Standard of Review

The trial court's ruling concerning a *Batson* challenge receives considerable deference from reviewing courts because it is largely based on an analysis of the prosecutor's credibility and demeanor. *State v. Carter*, 415 S.W.3d 685, 689 (Mo. banc 2013). The court's finding that there was no purposeful discrimination will only be overturned if it is clearly erroneous and the reviewing court is left with a definite and firm conviction that the trial court made a mistake. *Id*.

14

We defer to the trial court's factual findings and credibility determinations. *State v. Werner*, 9 S.W.3d 590, 595 (Mo. banc 2000).

B.     Analysis

Use of peremptory challenges to strike a potential juror based on his or her race or gender violates the right to equal protection under the Fourteenth Amendment. *Batson v. Kentucky*, 476 U.S. 79 (1986). Under *Batson*, once the complaining party has made a prima facie case for discrimination, the burden shifts to the other party to offer a race or gender neutral explanation justifying its peremptory strike, which rebuts the *prima facie* case. *State v. Parker*, 836 S.W.2d 930, 939 (Mo. banc 1992). The trial court must then decide whether the strike was motivated by purposeful discrimination. *Id*. at 934.

In determining whether the explanation for a peremptory strike was a pretext for purposeful discrimination, the principal consideration is the plausibility of the prosecutor's explanation in view of the totality of the circumstances. *Id*. at 939. Other relevant factors include: whether similarly-situated persons of a different race or gender were not stricken; the nexus between the explanation and the case to be tried in terms of the charges, evidence, and punishment; the demeanor of the excluded venirepersons; and the court's past experience with the attorneys. *State v. Dunn*, 906 S.W.2d 388, 391 (Mo. App. E.D. 1995). The explanation need not make sense to the trial court, but the court must believe the explanation and must be convinced that it does not amount to racial or sexual discrimination. *State v. Smulls*, 935 S.W.2d 9, 15 (Mo. banc 1996) ("A legitimate reason for exercising peremptory challenges is not one 'that makes sense' but one 'that does not deny equal protection.'") (citing *Purkett v. Elem*, 514 U.S. 765, 769 (1995)).

In this case, the defense properly raised a *Batson* objection to the peremptory strike of an African American male, Juror #518, raising a presumption of discrimination and shifting the burden to the State to offer a race and gender neutral explanation to rebut this presumption. In rebuttal, the State explained that it struck Juror #518 because his answers were "curt," his expressions were "completely disinterested and sort of unresponsive," "he mumbled his first few answers," and the juror "generally makes me nervous." The prosecutor also stated that a white female juror, Juror #1429, was stricken for giving "similar sort of responses." The defense argued generally that the State's reason was pretextual because: "the record [does not] support the state's explanations especially for the demeanor explanation. I didn't see it, and the state didn't inject it into the record or question the juror about it." The defense also argued that other seemingly inattentive white, male jurors were not stricken.[9] The court denied the defense's *Batson* motion, finding that the State's explanation was not pretextual. The court specifically agreed with the prosecutor's "description of [the juror's] demeanor and his answers," and stated that "the white female who was struck was similar."

The inattentiveness of a potential juror may be a valid race-neutral reason for using a peremptory challenge. *State v. White*, 913 S.W.2d 435, 437 (Mo. App. E.D. 1996). Thus, this point turns on whether it was clearly erroneous for the trial court to find that prosecutor's explanation was plausible in light of all the facts and circumstances. *Parker*, 836 S.W.2d at 939.

Where the attentiveness of a juror is at issue, the most important facts and circumstances for determining the plausibility of the state's explanation are the demeanor of the venireperson

---

[9] Reynolds now argues, for the first time on appeal, that Juror #1429 was not similarly-situated because she was not actually stricken by the State with a peremptory strike, but rather was dismissed by the court on its own motion apparently for cause. However, this argument was not raised before the trial court, and is therefore waived. *Smith v. Shaw*, 159 S.W.3d 830, 835 (Mo. 2005). Since this argument was not raised below, the court was unable to determine whether the prosecutor was mistaken, and if so, whether that fact undermined the plausibility of the prosecutor's explanation. *Id.* (under plain error review, appellate courts will generally not find that a trial court erred on an issue that the parties did not ask the court to rule upon).

16

who was challenged, and the demeanor and credibility of the prosecutor. *See State v. Broom*, 281 S.W.3d 353, 358 (Mo. App. E.D. 2009). This Court gives considerable deference to the trial court's ruling on a *Batson* challenge because the determination is largely based on an analysis of credibility and demeanor, issues of fact that the trial court is better situated to consider. *State v. Burnett*, No. ED102459, 2016 Mo. App. LEXIS 630, at *22 (Ct. App. June 21, 2016) (citing *Carter*, 415 S.W.3d at 689)*; see also Broom*, 281 S.W.3d at 358 (demeanor "cannot be gleaned from a transcript. . . . trial court was in the best position to determine if the prosecutor accurately described the venireperson's demeanor, and we defer to its determination of this issue").

From the cold record before us, it is impossible to determine the demeanor of Juror #518 and whether he did in fact appear inattentive. The trial court found that he was, and there is no basis in the record for concluding that *that* factual finding was clearly erroneous. The record demonstrates that his answers to questions during voir dire were short, often a single word. However, an additional basis for the prosecutor's determination that he was inattentive was his facial expressions which were "disinterested and sort of unresponsive." Facial expressions, which are illustrative of a person's demeanor, are impossible to ascertain from a written record.

Likewise, the transcript provides no basis for reexamining the demeanor and credibility of the prosecutor. The trial court was in a better position to determine the prosecutor's demeanor while explaining the reason for striking this potential juror. *See Werner*, 9 S.W.3d at 595 (reviewing court defers to trial court on credibility determinations). The court found this explanation was not a pretext for discrimination, and there is no basis in the record for finding that the trial court clearly erred in reaching this conclusion.

We find that the trial court's determination that there was no purposeful discrimination was not clearly erroneous. Point denied.

17

## CONCLUSION

We hold that: (1) the trial court did not plainly err by convicting Reynolds of both armed criminal action and unlawful use of a weapon for discharging a firearm at a vehicle because these convictions did not impose cumulative punishment in violation of the right to be free from double jeopardy; (2) Reynolds' request for plain error review is denied because his claim fails to establish substantial grounds for believing that the trial court's decision to dismiss two female jurors from the venire panel resulted in manifest injustice or miscarriage of justice; and (3) the trial court did not err in denying Reynolds' *Batson* motion because the court's determination that there was no purposeful discrimination was not clearly erroneous.

The judgment of the trial court is affirmed.

_____
Angela T. Quigless, P.J.

Robert G. Dowd, Jr., J., and
Lisa Van Amburg, J., Concurs.

18