**STATE of Missouri, Respondent,**

v.

**Stacy M. HOLMQUEST, Appellant.**

**No. WD 66552.**

Missouri Court of Appeals,
Western District.

Dec. 11, 2007.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Jan. 29, 2008.

Application for Transfer Denied
Feb. 19, 2008.

Irene C. Karns, Public Defender, Columbia, MO, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Roger W. Johnson, Asst. Attorney General, Jefferson City, MO, for Respondent.

Before HAROLD L. LOWENSTEIN, P.J., JAMES M. SMART, JR., and LISA WHITE HARDWICK, JJ.

JAMES M. SMART, JR., Judge.

Stacy Holmquest appeals her convictions for second-degree murder in violation of section 565.021,[1] first-degree robbery in violation of section 569.020, and first-degree burglary in violation of section 569.160. The judgment is affirmed.

## Background

The record on appeal indicates that the victim, David Zeller, was robbed and murdered in his home in Harrisonville, Missouri, on the night of January 16, 2005. His daughter, Shirley Ann Phillips, found his body the next morning. An investigation into his death revealed that those involved included Elvis Thornton, Regis Rummans, Veronica Villanueva, and Eric Villanueva.

Holmquest is the granddaughter of the victim, David Zeller. Holmquest was a friend of Veronica Villanueva. Holmquest first mentioned to her friend in February of 2004 that her grandfather had a safe in his house. Holmquest said she wanted her friend to find a couple of people to rob him.

On the night of January 7, 2005, Veronica Villanueva called Holmquest and asked her for a ride to a local McDonald's. Holmquest took Veronica and Eric Villanueva (Veronica's brother) and Rummans to the McDonald's. In the car, Holmquest told Veronica, Eric, and Rummans that she wanted her grandfather robbed and "gunned." Holmquest said that her grandfather had twelve million dollars in a safe underneath the floor of his office. She also indicated that she would like to burglarize the home of a wealthy business owner to whom she was not related.

The next day Veronica, Eric, and Rummans helped Holmquest move. After they helped her move, they drove by the houses of the two prospective victims so that Holmquest could show the others the locations. When they arrived at Mr. Zeller's house, Holmquest and Veronica went inside to speak to him. Holmquest informed the other passengers that a light would turn on in the room where the safe could be found. While Holmquest and Veronica were in the house, the light in the office was turned on, and Veronica tapped her foot on the floor to locate the safe. When they returned to the car, Veronica told Eric and Rummans that there was no safe in the house because she had not located it by tapping her foot on the floor. Holmquest insisted that the safe was there but that they would have to cut a hole in the floor to get to it. Holmquest also told Eric and Rummans that she would purchase handguns, ski masks, black bags, and black clothes if they needed it for the robbery.

---

1. All statutory references are to the Revised Statutes of Missouri, 2000.

A week later on January 15 around ten o'clock in the evening, Veronica and Eric were at their house with Elvis Thornton. Eric asked Thornton to give them a ride to Harrisonville in order to rob David Zeller. Thornton agreed to give Eric a ride, and the three went to David Zeller's house in Harrisonville. When they arrived at Mr. Zeller's house, Eric got out of the car and knocked on the front door. Mr. Zeller informed him that he does not open his door after dark, so Eric returned to the car and the three left.

The next night they returned. This time Eric, Veronica, Thornton, and Rummans were all in Thornton's car. Veronica dropped the others off at the house and gave Eric fifty cents to call her when they were ready to be picked up. She then went to a truck stop to wait.

Although there was no direct testimony as to what actually occurred in the house that night, the circumstantial evidence suggests that Eric, Rummans, and Thornton broke into Mr. Zeller's house, stole guns and other items, and shot him twice. One shot hit Mr. Zeller in the leg and one hit him in the back. The shot in his back was fatal. The house was placed in disarray. A hole was cut in the floor of Mr. Zeller's office. The three also stole Mr. Zeller's truck from his garage and drove it to the truck stop to meet Veronica.

After an investigation into Mr. Zeller's murder, Veronica, Eric, Rummans, and Thornton were all arrested. Holmquest was also arrested and charged for her involvement in the criminal enterprise. She was charged with one count of second-degree murder, one count of first-degree robbery, and one count of first-degree burglary. After hearing the above-outlined evidence, the jury returned a verdict of guilty on all counts. Holmquest waived jury sentencing, and the court sentenced her to life in prison for the murder count, fifteen years for the robbery count, and another fifteen years for the burglary count. Holmquest now appeals to this court.

## Sufficiency of the Evidence

■ Holmquest's first point argues that the evidence was insufficient as a matter of law to prove beyond a reasonable doubt that she "aided or assisted" the other perpetrators in executing the criminal enterprise as defined by section 562.041.[2] She argues that merely suggesting that the others should rob Mr. Zeller, telling them about the floor safe, and showing them the location is insufficiently specific or certain to constitute planning or encouragement of the offense.

When reviewing a challenge to the sufficiency of the evidence, we view all evi-

2. Section 562.041 provides:
1. A person is criminally responsible for the conduct of another when
(1) The statute defining the offense makes him so responsible; or
(2) Either before or during the commission of an offense with the purpose of promoting the commission of an offense, he aids or agrees to aid or attempts to aid such other person in planning, committing or attempting to commit the offense.
2. However, a person is not so responsible if:
(1) He is the victim of the offense committed or attempted;

(2) The offense is so defined that his conduct was necessarily incident to the commission or attempt to commit the offense. If his conduct constitutes a related but separate offense, he is criminally responsible for that offense but not for the conduct or offense committed or attempted by the other person;
(3) Before the commission of the offense he abandons his purpose and gives timely warning to law enforcement authorities or otherwise makes proper effort to prevent the commission of the offense.
3. The defense provided by subdivision (3) of subsection 2 is an affirmative defense.

dence and all reasonable inferences in the light most favorable to the verdict and disregard evidence and inferences to the contrary. *State v. Barnum,* 14 S.W.3d 587, 590 (Mo. banc 2000). Our review is limited to a determination of whether there was sufficient evidence from which a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *Id.* at 591.

A person is deemed criminally responsible for the conduct of others when "with the purpose of promoting the commission of an offense, [she] aids or agrees to aid or attempts to aid such other person in planning, committing or attempting to commit the offense." Section 562.041.1(2). It is not necessary that the defendant personally commit the elements of the offense. *Barnum,* 14 S.W.3d at 591. "Mere encouragement is enough." *Id.* Encouragement is conduct that by any means approves another's criminal action. *Id.* This includes encouraging or exciting a criminal act by words, gestures, looks, or signs. *Id.*

Holmquest argues that her conduct does not rise to the level of encouragement necessary for her to be criminally responsible for the conduct of Eric, Rummans, Veronica, and Thornton. Her argument seems to be based on the notion that she was not personally present at the time of the robbery and murder. The case of *State v. Mills,* 809 S.W.2d 1 (Mo.App. 1990), shows that one does not have to be present at the time of the actual crime to be guilty of unlawfully encouraging the crime. In *Mills,* the defendant, Mills, suggested to his friend, Vrable, that Vrable rob Mills' roommate, Brooks. *Id.* at 2. Mills told Vrable that Brooks carried a large amount of money on him, that Brooks frequently came home intoxicated and so would be "easy pickings," and suggested that Vrable hit Brooks over the head with a baseball bat. *Id.* at 3. While

Mills was not present, Vrable went into Brooks' home, hit him over the head with a tire iron, and stole money from him. *Id.* at 2. Mills' encouragement occurred before the crime was executed. Mills also was not present when the crime took place. The court found the evidence sufficient to find him guilty under an accomplice liability theory. *Id.* at 3. The court found that Mills had provided Vrable "with information regarding the identity and residence of the victim, the victim's possession of a large amount of cash, and the victim's tendency to be drunk and thus easily robbed" and had also "suggested the method and means for carrying out the robbery, by hitting the victim over the head with a bat, and suggested a second meeting to further plan the robbery." *Id.*

Similarly, although Holmquest was not present when the robbery of Mr. Zeller's residence took place, she had suggested the criminal enterprise to those who carried it out, had told them of a floor safe and indicated in which room it could be found, indicated that she wanted her grandfather robbed and "gunned," and had offered to buy things such as guns and black clothing in order to aid them in committing the robbery. She made the suggestions about robbing Mr. Zeller on more than one occasion and showed them the location of the home in order to facilitate the robbery. A reasonable jury could conclude beyond a reasonable doubt that Holmquest aided or encouraged Eric, Rummans, Thornton, and Veronica to carry out the criminal enterprise.

Holmquest also suggests that there was insufficient evidence of her mental state. She points to language contained in *State v. Neal,* 14 S.W.3d 236, 239 (Mo.App. 2000), that "the conduct of the person actually committing the offense may be imputed to the defendant [but] the mental state cannot be similarly imputed." Recently

this court, in *State v. Smith,* 229 S.W.3d 85, 94–95 (Mo.App.2007), rejected this concept. We said in *Smith* that, in cases other than that of murder in the first degree, the only showing required as to the culpable mental state of an accomplice is that, in aiding the principal in the commission of the offense, he acted with the purpose to promote the conduct of the principal that constituted the offense for which the accomplice is being held liable. *Id.* at 95.

These principles are consistent with the plain language of section 562.041 and MAI–CR3d 304.04. The prosecution must prove only that the defendant had a purpose to promote the commission of the offense. Section 562.041.1(2). It is not necessary that the prosecution prove an additional or separate mental state. There certainly was sufficient evidence in the record here from which a reasonable jury could conclude that Holmquest had a purpose to promote the commission of the offenses. Point I is denied.

### Improper Bolstering

■ Holmquest's second point asserts that certain testimony elicited from Detective Doug Catron at trial about what Veronica had told him was improper bolstering of Veronica's testimony. Essentially, Det. Catron testified that prior to the prosecutors offering Veronica any plea bargain for her testimony, she had told the same story to him that she told at trial. Holmquest claims this testimony improperly bolstered Veronica's testimony. She claims that Veronica's testimony, and, therefore, her credibility, was central to the State's case, because she was the only witness to testify about any of the suggestions Holmquest made to the other perpetrators. Therefore, she argues, improper bolstering of her testimony was highly prejudicial.

■ The trial court has broad discretion to admit or exclude evidence at trial and its decision will not be disturbed absent a clear abuse of discretion. *State v. Simms,* 131 S.W.3d 811, 816 (Mo.App.2004). "Improper bolstering occurs when an out-of-court statement of a witness is offered solely to duplicate or corroborate trial testimony." *State v. Wolfe,* 13 S.W.3d 248, 257 (Mo. banc 2000). If a party can present the same testimony in multiple forms, he may obtain an undue advantage. *State v. Lee,* 841 S.W.2d 648, 654 (Mo. banc 1992) (*quoting State v. Seever,* 733 S.W.2d 438, 441 (Mo. banc 1987)).

■ However, prior consistent statements may be admissible for the purpose of rehabilitating a witness whose credibility has been called into question. *State v. Ramsey,* 864 S.W.2d 320, 329 (Mo. banc 1993). On cross examination, defense counsel called Veronica's credibility into question by pointing out that she was being offered a plea bargain in exchange for her testimony. Based on the questions of defense counsel, Veronica admitted that she had requested to talk to the police in order to possibly get herself out of jail. Afterwards, she agreed to testify against Holmquest as part of a plea agreement. The implication sought by the defense, of course, was that Holmquest's participation was never brought up until Veronica saw that she could get a favorable plea agreement by implicating Holmquest.

■ Later, the prosecutor asked Det. Catron if Veronica had implicated Holmquest in the criminal enterprise prior to being offered a plea bargain. Det. Catron indicated that Veronica had implicated Holmquest before the discussion of the plea bargain. His testimony was presented to show a prior consistent statement. A prior consistent statement is admissible to rehabilitate a witness whose credibility has been questioned by an express or im-

plied claim of recent fabrication. *State v. Christeson,* 50 S.W.3d 251, 267 (Mo. banc 2001). Det. Catron's testimony was admissible as a prior consistent statement for this purpose. Point II is denied.

### *Voir Dire* Inquiry

■ Holmquest's final point concerns inquiries made by the prosecution during *voir dire.* Specifically, the prosecutor questioned the jury panel as follows:

MR. TAYLOR [the prosecutor]: . . . Sometimes it is necessary to give some people consideration from prosecution so that others may be prosecuted for committing a crime, and one of the witnesses called by the State has been given such a deal so that she can testify against this Defendant. Will the giving of a deal to someone who has allegedly aided in committing an alleged crime, say, it's allegations this Defendant committed, would that be so objectionable to any of you that they could not judge the testimony of this witness given by the legal standards that the Judge is going to give you? In other words, would you have a difficult time judging the testimony or listening to the testimony of somebody who has been given a deal to testify on behalf of the State?

[Jurors 29, 11, 19, and 20 indicated that they would have difficulty.]

THE COURT: I want to interrupt again, and I want to tell you that when I interrupt it is not, in any respect, indicated to try to change to your response. I want your responses, and I want them honestly. I just want to make sure that you understand the nature of the question, and it's for my benefit. I have to make these decisions on who gets to stay and who doesn't based on your answers. And, of course, the question is not whether you are going to believe that testimony of that witness no matter

what. In fact, you are entitled to give the testimony of that witness whatever weight and value you think it should be entitled to in consideration of the fact that she's been given a deal to testify. The question really boils down to this: Are you going to disregard her testimony—are you going to disregard it because she was given a deal? That's the question. Because, you know, human nature says, "Well, yeah, I am going to look pretty carefully at her testimony if she got a deal to testify." You are entitled to do that. I just want to make sure you understand what the question calls for. Okay. Go ahead. Then with regard to that question, go ahead.

[The same jurors indicated that they would have difficulty.]

MR. TAYLOR: I see no further hands. Because this person was alleged to have been an accomplice with this Defendant, is there anybody on the panel that would disregard her testimony solely based on that fact? The fact that she was an accomplice or alleged to have been an accomplice?

(No response.)

MR. TAYLOR: I see no hands. It may appear to you as the evidence unfolds in this case that this co-defendant was more involved in the charged crimes than this Defendant. If that should occur, would that fact, by itself, cause you to disregard the testimony of that Defendant?

[Defense counsel here objected, suggesting that the prosecutor was asking the panel to commit to their assessment of the witness's credibility. The court overruled the objection, but stated that the prosecution should go no further in its questioning. No jurors indicated a problem with the prosecutor's question.]

Holmquest claims, as she did at trial, that the inquiry was improper because it

asked the jury panel to commit to its assessment of Veronica's credibility before having heard her testimony or any other evidence.

 "A defendant is entitled to a fair and impartial jury." *State v. Clark*, 981 S.W.2d 143, 146 (Mo. banc 1998). The purpose of *voir dire* is to discover potential bias or prejudice in order to select a fair and impartial jury. *Id.* For this reason, liberal latitude is allowed in the examination of potential jurors. *Id.* It is well settled that the extent of questioning during *voir dire* is within the discretion of the trial court. We will reverse only for an abuse of that discretion coupled with a probability of prejudice to the defendant. *State v. Ferguson*, 20 S.W.3d 485, 494 (Mo. banc 2000).

 There are certain limits to *voir dire*, however. Counsel may not, for instance, try the case on *voir dire*, may not attempt to elicit a commitment from the jurors about how they would react to hypothetical facts, and may not seek to predispose any of the jurors to react a certain way to anticipated evidence. *Clark*, 981 S.W.2d at 146–47. "[W]hen the inquiry includes questions phrased or framed in such manner that they require the one answering to speculate on his own reaction to such an extent that he tends to feel obligated to react in that manner, prejudice can be created. The limitation is not as to the information sought but in the manner of asking." *Id.* (*quoting State v. Garrett*, 627 S.W.2d 635, 642 (Mo. banc 1982)).

Here, the prosecutor asked the jury three questions: (1) whether they would necessarily disregard the testimony of someone who had been given a deal, (2) whether they would necessarily disregard the testimony of an accomplice, and (3) whether they would necessarily disregard the testimony of someone who appeared to be more culpable than the defendant. These three questions were all distinct, different questions. The prosecutor was attempting to see if any of these elements of Veronica's character would cause the jury to immediately disregard her testimony. The questions were not repetitious. They were separate questions about possible biases that the jurors might have had against Veronica as to different aspects of Veronica's testimony.

The court interrupted during the prosecutor's questioning and explained to the jurors that the prosecutor was not telling them that they could not consider these things in its assessment of Veronica's credibility. The court clarified that "the question is not whether you are going to believe that testimony of that witness no matter what. In fact, *you are entitled to give the testimony of that witness whatever weight and value you think it should be entitled to in consideration of the fact that she's been given a deal to testify.*" (Emphasis added.) Although this interruption came before the second of the three questions, it is obvious the court meant it to apply to all the questions. Additionally, the prosecutor phrased his subsequent questions in a way that mirrored the court's clarification when he said, "is there anybody on the panel that would *disregard her testimony solely based on that fact* [that she was an accomplice]?" and "would that fact [that she might be more culpable], *by itself, cause you to disregard the testimony of that Defendant*?"

The prosecutor's questions were three distinct questions about different aspects of Veronica's testimony. They were not an attempt to cause the jury to commit to its assessment of Veronica's credibility or an attempt to predispose the jurors. The trial court interjected and clarified that the jury was permitted to consider these matters in its assessment of Veronica's credi-

bility when she was called to testify, and the prosecutor reemphasized the court's clarification in his later questions. The court did not abuse its discretion in allowing the questions. Point III is denied.

## Conclusion

For all of the foregoing reasons, the judgment is affirmed.

LOWENSTEIN and HARDWICK, JJ., concur.

