**STATE of Missouri, Respondent,**

v.

**Kristopher Monte PRINCE, Appellant.**

**No. WD 70337.**

Missouri Court of Appeals,
Western District.

March 9, 2010.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 27, 2010.

Application for Transfer Denied
June 29, 2010.

Melinda K. Pendergraph, Columbia, MO, for appellant.

Shaun J. Mackelprang and James B. Fransworth, Jefferson City, MO, for respondent.

Before Division Four: THOMAS H. NEWTON, Chief Judge, KAREN KING MITCHELL, Judge and CYNTHIA L. MARTIN, Judge.

CYNTHIA L. MARTIN, Judge.

Kristopher Prince appeals the trial court's judgment convicting him of second degree murder, unlawful use of a weapon, and armed criminal action. Prince alleges that the trial court: (1) erred in denying his motions to dismiss, accepting the verdicts, and sentencing him on second degree murder and unlawful use of a weapon in violation of his right of protection against double jeopardy; (2) erred in denying his motions to dismiss, accepting the verdicts, and sentencing him on unlawful use of a weapon and armed criminal action in violation of his right of protection against double jeopardy; (3) abused its discretion in overruling Prince's objection

to the admission of jail tapes because they were inaudible and improperly bolstered a codefendant's testimony; (4) abused its discretion in overruling Prince's objection to the State's improper closing argument; (5) plainly erred in admitting testimony regarding Prince's right to remain silent; and (6) abused its discretion in denying Prince's motion for continuance. We affirm.

### Factual and Procedural History

On April 12, 2007, Prince and his cousin, Lorenzo Ladiner, bought an assault rifle for the purpose of robbing a local drug dealer, Larry McBride. They stored the rifle at Ladiner's home. Later that same day, Ladiner was pulled over and arrested on an outstanding warrant. The next day, when Prince went to post bail for Ladiner, Prince was arrested on an outstanding warrant. From April 13 to 18, 2007, Prince remained in custody at the Boone County jail. During his confinement, Prince made several phone calls to Ladiner in which they discussed their plans to assault and rob McBride.

While Prince was in custody, Ladiner fired shots at McBride's vehicle. When Prince was released, he went to Ladiner's house. McBride pulled up to the house with Tedarrian Robinson and Carlos Dudley. McBride accused Ladiner of shooting at his house which led to a heated verbal exchange. Prince attempted to open McBride's door, and McBride drove off.

Prince and Ladiner ran inside Ladiner's house. Prince grabbed the assault rifle and Ladiner grabbed the car keys to chase after McBride. When they caught up with McBride, Prince leaned out the passenger window and fired at least five shots at McBride's vehicle. One bullet pierced the trunk of McBride's vehicle, traveled through the rear seat to the front passenger headrest, and struck Robinson in the neck. Prince and Ladiner returned to Ladiner's house and hid the rifle in the attic. McBride drove toward the hospital. Dudley called the police and reported that Prince was the shooter. The police pulled McBride over and took Robinson to the hospital where he was pronounced dead.

Police responded to Ladiner's house and arrested both Ladiner and Prince. Prince was charged with murder in the second degree, section 565.021[1] (felony murder), unlawful use of a weapon by shooting a firearm from a motor vehicle, section 571.030.1(9), and armed criminal action, section 571.015.[2] Prior to trial, Prince filed a motion for continuance and several motions to dismiss based on double jeopardy and statutory grounds, all of which were denied by the trial court. A jury found Prince guilty on all three counts. Prince was sentenced to consecutive sentences of thirty years for felony murder, fifteen years for unlawful use of weapon, and five years for armed criminal action. Prince appeals.

### Point I

Prince argues that the trial court erred in sentencing him for both felony murder and unlawful use of a weapon because the cumulative sentences imposed for these convictions violated his right to be free from double jeopardy and violated section 556.041(3), as he was effectively convicted of a general crime and a specific crime based on the same conduct. The Double Jeopardy Clause of the Fifth Amendment prevents a defendant from be-

---

1. All statutory references are to RSMo 2000 as supplemented unless otherwise indicated.

2. Prince was originally charged with an additional count of armed criminal action but the State later dropped the charge.

ing subjected to multiple punishments for the same offense. *Peiffer v. State,* 88 S.W.3d 439, 442 (Mo. banc 2002). "Double jeopardy analysis regarding multiple punishments is ... limited to determining whether cumulative punishments were intended by the legislature." *State v. McTush,* 827 S.W.2d 184, 186 (Mo. banc 1992) (citing *Missouri v. Hunter,* 459 U.S. 359, 366–69, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983)). When the legislature specifically authorizes cumulative punishments under two statutes that proscribe the same conduct, cumulative punishments may be imposed against the defendant without violating the Double Jeopardy Clause. *Id.* Thus, in resolving the question of double jeopardy where cumulative punishment is claimed, legislative intent is paramount.

Section 556.041(3) prohibits the conviction of more than one offense if "[t]he offenses differ *only* in that one is defined to prohibit a designated kind of conduct generally and the other to prohibit a specific instance of such conduct." (Emphasis added.) Prince was convicted of felony murder, the commission of any felony that results in death. The felony that served as the predicate offense for the felony murder conviction was the charge of unlawful use of a weapon by shooting a firearm from a motor vehicle, a violation of section 517.030.1(9). Prince *contends* that he was also convicted of the *enhanced* charge of unlawful use of a weapon by shooting a firearm from a motor vehicle *resulting in death.* This enhanced charge is described in section 571.030.7, which provides that a violation of section 571.030.1(9) is a class B felony "except that if the violation of subdivision (9) of subsection 1 ... results in injury or death to

another person, it is a class A felony." Prince thus takes the position that he was convicted and sentenced twice for the same crime—the commission of a felony resulting in death—with one offense (felony murder) designating his conduct generally and one offense (enhanced violation of section 571.030.1(9)) designating his conduct specifically. As a result, Prince contends his cumulative sentences for both convictions violate section 556.041(3). This point is without merit as Prince's claim is predicated on a false premise.

The State initially charged Prince with a class A felony—the enhanced violation of section 571.030.1(9) pursuant to section 571.030.7. However, prior to trial, the State filed a second amended information in which the enhanced unlawful use of a weapon charge was reduced to the *unenhanced* class B felony of unlawful use of a weapon pursuant to section 571.030.1(9). The jury was instructed on the class B felony of unlawful use of a weapon which, though requiring proof of Prince's discharge of a firearm from a motor vehicle, did not require proof that the discharge resulted in the death of another. Prince was convicted of, and sentence was imposed on, the class B felony of unlawful use of a weapon. Despite Prince's contention to the contrary, Prince was not convicted of, nor sentenced for, the enhanced version of section 571.030.1(9). He was, therefore, not convicted of two crimes possessing as a required element a "resulting death." Because Prince has posited a factual scenario that did not occur, we need not address the substantive issue posed by Prince's point relied on.[3] Point one is denied.

3. Prince has not asked us to review whether his convictions for felony murder and for the unenhanced version of unlawful use of a weapon in violation of section 571.030.1(9) violate section 556.041(3), though we note

that section 565.021.2 expresses the legislature's intention that "the punishment for second degree murder shall be in addition to the punishment for commission of a related felo-

## Point II

Prince argues that the trial court erred in denying his motions to dismiss, accepting the jury's verdicts, and sentencing him because convictions of unlawful use of weapon and armed criminal action violated his right to be free from double jeopardy and violated section 571.015.4, since the legislature did not intend cumulative punishment. We disagree.

## Standard of Review

"Whether an individual's right to be free from double jeopardy has been violated is a question of law, which an appellate court reviews *de novo*. When an appellate court's review is *de novo*, it need not defer to the trial court's determination of law." *State v. Kamaka*, 277 S.W.3d 807, 810 (Mo.App. W.D.2009) (citation omitted).

## Analysis

■ In this point, Prince argues that cumulative punishments for armed criminal action and unlawful use of a weapon are barred by the armed criminal action statute, section 571.015.[4] Prince was convicted of unlawful use of a weapon pursuant to section 571.030.1(9) for knowingly discharging a firearm from a vehicle and armed criminal action pursuant to section 571.015.

As previously noted, the Fifth Amendment's Double Jeopardy Clause protects a defendant from multiple punishments for the same offense. As this protection has been construed to turn on whether cumulative punishments were intended by the legislature, our analysis of this point must turn on construction of section 571.015.

The armed criminal action statute, section 571.015, provides:

1. Except as provided in subsection 4 of this section, any person who commits any felony under the laws of this state by, with, or through the use, assistance, or aid of a dangerous instrument or deadly weapon is also guilty of the crime of armed criminal action. . . .

. . . .

4. The provisions of this section shall not apply to the felonies defined in sections 564.590, 564.610, 564.620, 564.630, and 564.640, RSMo.

Prince concedes that section 571.030.1(9) of which he was convicted for discharging a firearm at or from a motor vehicle is not expressly included in section 571.015.4 as an offense for which cumulative punishment is prohibited by the legislature. Nonetheless, Prince suggests we should construe section 571.015.4 to include section 571.030.1(9) within its scope because section 571.030.1(9) was enacted nearly twenty years after the legislature enacted section 517.015 and the legislature has simply neglected to amend section 571.015.4 from time to time as necessary to keep pace with changes in the specific conduct now defined to constitute an unlawful use of weapons charge. We do not agree.

The confusion with respect to what is or is not meant by the legislature to be excluded from cumulative punishment along with a conviction for armed criminal action under section 571.015 is due in large measure to the fact the statutes enumerated in section 571.015.4 (which was enacted in 1977) were renumbered/transferred in 1978 and were then repealed in 1981. *See State ex rel. Green v. Moore*, 131 S.W.3d 803, 807–08 (Mo. banc 2004). Notwith-

---

ny or attempted felony, other than murder or manslaughter."

4. We note that Prince does not argue that these two convictions are barred by Missouri's double jeopardy rules in section 556.041.

standing, Section 571.015.4 has never been amended to keep pace with the transfer, repeal, revision, and recodification of the enumerated offenses for which the legislature originally expressed an intent to prohibit cumulative punishment. The challenge, therefore, has been to determine legislative intent given the antiquated references in section 571.015.4. Universally, and notwithstanding the 1981 repeal of the statutes enumerated in section 517.015.4, our courts have opted to equate the substantive scope of revised and recodified statutes with the substantive scope of the statutes originally enumerated in section 571.015.4. This is consistent with the fact that in 1982, the year after the 1981 repeal of the transferred sections enumerated in section 517.015.4, the legislature nonetheless enacted section 571.017 which provides:

> Nothing contained in any other provision of law, *except as provided in subsection 4 of section 571.015,* shall prevent imposition of sentences for both armed criminal action and the crime committed by, with, or through the use, assistance, or aid of a dangerous instrument or deadly weapon.

(Emphasis added.) Thus, albeit with less than stellar attention to fine details, the legislature's enactment of section 571.017 in 1982 appears clearly to have restated its continuing intention to treat the offenses described in section 571.015.4 as the *only* felony offenses which cannot serve as a predicate for an armed criminal action charge and as the *only* felony offenses for which cumulative punishment along with an armed criminal action conviction is not permitted.

Our charge, therefore, is to assess whether section 571.030.1(9), of which Prince was convicted, equates with any of the now repealed statutory offenses enumerated in section 571.015.4. We find it

does not. Section 564.610 is the enumerated section Prince suggests should be equated with section 571.030.1(9). Section 564.610 was transferred in 1978 to section 571.115. Under section 564.610 (then section 571.115) prior to its repeal in 1981, the statutes prohibited the following offenses: carrying a concealed weapon; exhibiting a weapon in an angry or threatening manner; possession of a weapon while intoxicated; possessing a firearm in a church, school, election precinct on election day, court or other public assemblage; and selling or delivering a weapon to a minor. Section 571.030 revised and recodified each of these offenses as follows: section 571.030.1(1) (carrying a concealed weapon); section 571.030.1(4) (exhibiting a weapon in an angry or threatening manner); section 571.030.1(5) (possessing or discharging a firearm while intoxicated); section 571.030.1(8) (possessing a firearm in a church, election precinct on election day, or in a government building); and section 571.030.1(10) (possessing a firearm in a school).

As Prince accurately notes, our courts have had no difficulty concluding that sections 571.030.1(1), (4), (5), (8), or (10) cannot serve as the predicate offense for a charge of armed criminal action under section 571.015, and cannot, therefore, be cumulatively punished with an armed criminal action conviction. In *Green,* our Supreme Court held that a charge for exhibiting a lethal weapon in an angry or threatening manner under section 571.030.1(4) could not serve as the predicate offense for an armed criminal action charge under section 571.015. 131 S.W.3d at 807–08. This same result was reached in *Ivy v. State,* 81 S.W.3d 199, 206–08 (Mo.App. W.D.2002), and in *State v. King,* 748 S.W.2d 47, 50 (Mo.App. E.D.1988).

In contrast, in *State v. Couts,* 133 S.W.3d 52, 53 (Mo. banc 2004), our Su-

preme Court concluded that use of a weapon by shooting into a dwelling under section 571.010.1(3) was "not one of the types of unlawful use of a weapon listed in section 571.015.4." *Id.* at 53. In *Couts*, the section 571.015.4 violation served as the basis for Couts's charge and conviction for second degree murder. In turn, the second degree murder charge served as the predicate for the armed criminal action charge and conviction. *Id.* Because the offense described in section 571.010.1(3) had never been included within the offenses described in the enumerated statutes in section 571.015.4, the Supreme Court had no difficulty concluding the "neither section 571.015.4 nor general double jeopardy principles preclude defendant's conviction of armed criminal action predicated on his second-degree murder conviction." *Id.*

Prince argues that *Couts* is distinguishable from his case because the Supreme Court noted that the charge of unlawful use of a weapon by shooting into a dwelling was encompassed in an already existing statute—section 562.070—at the time section 571.015.4 was enacted. In contrast, the offense of unlawful use of a weapon by shooting from a motor vehicle did not exist until section 571.030.1(9) was enacted in 1995, eighteen years after section 571.015 was enacted. Prince suggests that the legislature's intent with respect to incorporation of section 571.030.1(9) into the scope of section 571.015.4 is thus unclear. We disagree.

Though the Supreme Court in *Couts* did note that section 571.030.1(3) was encompassed in an existing offense when section 571.015 was enacted, suggesting the legislature's failure to include that offense

within the ambit of section 571.015.4 was purposeful, this observation merely added additional support for the Court's conclusion that legislature did not intend to prohibit cumulative punishment for armed criminal action and felony murder predicated on a charge of unlawful use of a weapon by shooting into a dwelling pursuant to the clear language of section 517.015. The Court noted:

> Subsection 1 of section 571.015 specifically states the legislature's intent that a person can be convicted of armed criminal action for commission of any felony through the use of a dangerous weapon other than those specifically listed in section 571.015.4.... [B]ecause section 571.015.4 does not enjoin cumulative punishments for armed criminal action and this particular form of unlawful use of a weapon, [the defendant's] armed criminal action conviction does not violate either section 571.015.4 or general double jeopardy principles.

*Couts,* 133 S.W.3d at 56.[5]

The circumstances before us are not distinguishable from the central holding in *Couts.* Prince concedes that section 571.030.1(9) is not included in the list of exceptions enumerated in section 571.030.1(4). There is no legal support offered by Prince for the proposition that we can find ambiguity in section 571.015 merely because the offense described in section 571.030.1(9) did not exist at the time section 571.015 was enacted. The legislature is presumed to know the state of the law when it enacts a statute. *State v. Rousseau,* 34 S.W.3d 254, 261 (Mo.App. W.D.2000). Further, the legislature is presumed to intend what the statute says, and we give effect to the words based on

---

5. The Supreme Court further noted that any *dicta* in the decisions in *Ivy* or *King* suggesting that all types of unlawful use of a weapon offenses found in section 571.030 are barred as predicates for armed criminal action should be ignored. *Couts,* 133 S.W.3d at 56 n. 6.

their plain and ordinary meaning. *Johnson v. Mo. Dep't of Corr.*, 166 S.W.3d 110, 111 (Mo.App. W.D.2005). If anything, the fact that the legislature did not amend section 571.015.4 when it enacted section 571.030.1(9) provides as strong an indication of legislative intent as the reverse scenario involved in *Couts* where the specific unlawful use of a weapon offense already existed at the time section 571.015 was enacted. In either case, the legislature's failure to act though presumed to know the state of the law suggests legislative intent not to include additional unlawful use of a weapon offenses within the scope of section 571.015.4 beyond those expressly therein enumerated. *Cook v. Newman*, 142 S.W.3d 880, 888 (Mo.App. W.D.2004).

Prince essentially suggests that this court should act as the legislature to create another exception in section 571.015(4). We decline to do so. Though it might be less confusing if section 571.015 barred all unlawful use of weapon offenses as predicates for armed criminal action, the Supreme Court has correctly noted this is a decision for the legislature. *Couts*, 133 S.W.3d at 56. Point two is denied.

### Point III

For his third point, Prince claims that the trial court abused its discretion in overruling his objections to the audio recordings of his phone conversations with Ladiner while he was in jail. Prince claims that the recordings were inaudible and improperly bolstered Ladiner's testimony. We disagree.

On April 13, 2007, six days before the victim was killed, Prince was arrested on an outstanding warrant. Between April 14 and April 17, Prince made phone calls to Ladiner from the Boone County jail. Prince was released on April 18, but later arrested that same day for Robinson's murder. Prince made three more calls. All of these calls were recorded by the jail.

On direct, Ladiner testified generally as to the content of the conversations between him and Prince. The State showed Ladiner the compact discs which contained the recordings. Ladiner testified that he had listened to them. The State offered the recordings into evidence to which Prince objected on the basis that they were inaudible and that Ladiner had already testified to their contents rendering them improper bolstering. The trial court overruled the objection. While Ladiner was on the stand, the State played each of the recordings of his conversations with Prince, periodically stopping the recordings to ask Ladiner to explain details about the conversations.

### Standard of Review

"The trial court has broad discretion to admit or exclude evidence at trial and its decision will not be disturbed absent a clear abuse of discretion." *State v. Holmquest*, 243 S.W.3d 444, 449 (Mo.App. W.D.2007). "A trial court abuses its discretion when the decision is against the logic of the circumstances and when 'it is so arbitrary and unreasonable as to shock the sense of justice and indicate[s] a lack of careful consideration.'" *State v. Chism*, 252 S.W.3d 178, 182 (Mo.App. W.D.2008) (citation omitted). "'[A] conviction will be reversed due to admission of improper evidence only if the defendant proves prejudice by showing a reasonable probability that in the absence of such evidence the verdict would have been different.'" *State v. Tillman*, 289 S.W.3d 282, 294 (Mo.App. W.D.2009) (quoting *State v. Thompson*, 112 S.W.3d 57, 63 (Mo.App.2003)).

### Analysis

#### Audibility of the Recordings

Prince generally claims that the audio recordings of his conversations from the

jail were inaudible and the trial court abused its discretion in admitting them into evidence. Prince primarily relies on *State v. Long*, 336 S.W.2d 378, 379–80 (Mo. banc 1960), where the trial court sustained an objection to audio tapes due to their poor quality. Prince also cites to *United States v. Huff*, 959 F.2d 731, 737 (8th Cir.1992), and *State v. Anthony*, 837 S.W.2d 941, 944 (Mo.App. E.D.1992), for the statements that trial courts have discretion to admit partially inaudible tapes, and if they are unintelligible, they may render the entire recording untrustworthy. This point is without merit. Upon our review of the recordings, they are audible and, as such, the trial court did not abuse its discretion in admitting them into evidence.

Even if the recordings were partially inaudible, they are not rendered untrustworthy. *State v. Taylor*, 831 S.W.2d 266, 271 (Mo.App. E.D.1992). This determination is within the trial court's discretion, which will not be disturbed absent a clear abuse of discretion. *Id.*

### Improper Bolstering

 Improper bolstering occurs when out-of-court statements are offered solely to duplicate or corroborate trial testimony. *Holmquest*, 243 S.W.3d at 449. Our review of the record indicates that is not the case here. Although Ladiner testified about the contents of his phone discussions with Prince, the playing of the recordings was not duplicative. Ladiner's testimony explained context, references, and identified who was talking. This was not the same testimony in a different form as prohibited by our holding *Holmquest*.

Prince relies on *State v. Seever*, 733 S.W.2d 438 (Mo. banc 1987), and *State v. Cole*, 867 S.W.2d 685 (Mo.App. E.D.1993). However, both are distinguishable. In *Seever*, the State played a video statement of a child victim and then had the victim testify to all the elements of the case. 733 S.W.2d at 439–40. The testimony was duplicative of the victim's statements in the video. *Id.* at 441.

In *Cole*, the witness gave a taped statement of details of a shooting. 867 S.W.2d at 686. The witness testified at trial. *Id.* On cross-examination, the defense pointed out four specific inconsistencies between her trial testimony and her recorded statement and played those portions for the jury. *Id.* Then, the State played the entire statement over objection. *Id.* The Eastern District held that playing the entire tape was improper bolstering because it substantially repeated the in-court testimony of the witness. *Id.*

In the present case, Ladiner testified only generally about his discussions with Prince prior to the recordings being played. As the recordings were played, they were periodically stopped for clarification and explanation about some of the discussion. Often this was necessary to explain the use of slang phrases and unfamiliar terminology. The recordings were not improperly duplicative of Ladiner's testimony.

The trial court did not abuse its discretion in admitting the audio recordings. Point three is denied.

### Point IV

In point four, Prince argues that the trial court abused its discretion in overruling defense counsel's objection to the State's improper closing argument that Prince instructed Ladiner to "ice that dog" because it misstated the evidence and because Prince was prejudiced in being portrayed as a ruthless killer.

### Standard of Review

The trial court has broad discretion in controlling closing argument, and we re-

view the trial court rulings during closing argument for abuse of discretion. *State v. Forrest,* 183 S.W.3d 218, 226 (Mo. banc 2006). " '[C]ounsel is traditionally given wide latitude to suggest inferences from the evidence on closing argument.' " *Nelson v. Waxman,* 9 S.W.3d 601 (Mo. banc 2000) (quoting *Moore v. Mo. Pac. R.R. Co.,* 825 S.W.2d 839, 844 (Mo. banc 1992)). "This is so 'even though the inferences drawn are illogical or erroneous.' " *Id.* (citations omitted).

### Analysis

■ Prince argues that the following portion of the State's closing argument was improper:

> Please go ahead and take those tapes back there. And I think—if you want to play it over and over again, you don't even need to, because the defendant is already talking about slapping Larry, robbing him, getting in his pockets. But I think if you want to go back there and listen to these—this tape again, you're going to hear, you're going to hear the defendant say, "I don't care. Ice that dog, Ice him."

The trial court overruled Prince's first objection and later instructed the jury to recall the evidence. Prince contends that the trial court erred because the State misstated the evidence. We disagree.

A review of the record shows that on direct, prior to playing the audio recordings, Ladiner testified generally about his conversations with Prince. Ladiner testified that Prince had told him that he wanted to "ice" McBride, and he explained that "to ice him" meant to kill him. The State played a portion of the recordings and then asked Ladiner about one statement which, after hearing the tape, Ladiner claimed was Prince saying "it's like that." The State stated, "He didn't say, '[i]ce that

dog?' " Ladiner replied, "That's not what he said."

The State's argument was appropriate. Ladiner had answered on direct that Prince told him that he wanted to "ice" McBride. Except for the one passage of the jail tapes about which the State pressed Ladiner, no other reference to "icing" the victim is heard on the tapes, however. Though Ladiner disagreed when directly questioned that a portion of one of the tapes included Prince saying "[i]ce that dog," the jury could have believed otherwise. Directing the jury to listen to the tapes was appropriate, therefore, in light of Ladiner's specific testimony that Prince told him to "ice" McBride— a statement which would have been recorded on a jail tape. The State's argument was supported by the evidence, and the trial court did not abuse its discretion. This point is without merit. Point four is denied.

### Point V

For his fifth point, Prince asserts that the trial court *plainly erred* in admitting: (1) the testimony of Ben White about Prince's failure to speak about his case in the audio recordings of his conversations from the jail, (2) audio recordings from jail in which Prince states to family members that he could not discuss his case on the phone at the jail, and (3) argument by the State that his silence about his involvement in the murder in the phone calls with his family from the jail should be considered evidence of his guilt. We disagree.

### Standard of Review

Prince concedes that he failed to properly preserve this point, which is actually comprised of multiple subparts, and, therefore, requests plain error review pursuant to Rule 30.20. "Review of plain error under Rule 30.20 involves a two-step process.

First, we must determine if the claim on its face establishes substantial grounds to find that manifest injustice or miscarriage of justice has resulted." *State v. Lewis,* 243 S.W.3d 523, 525 (Mo.App. W.D.2008) (citation omitted). Not all prejudicial error can be deemed plain error. *State v. Calhoun,* 259 S.W.3d 53, 58 (Mo.App. W.D. 2008). "Plain error is evident, obvious, and clear error." *Id.* If plain error is evident on the face of the claim, then we may proceed to consider whether or not a miscarriage of justice or manifest injustice will occur if left uncorrected. *Lewis,* 243 S.W.3d at 525. Where no plain error appears on the face of the claim, we should decline to exercise our discretion to review the claim. *Id.*

### Analysis

■■■ Prince argues that the State improperly argued his post-*Miranda* silence to incriminate him when it called its investigator, Ben White, who testified that he had listened to the audio recordings of Prince's phone calls from the jail. White testified to what Prince did *not* say in those recordings, including that he never said that Ladiner was the shooter, that the occupants in the victim's car shot back at them, or that there was a third car involved in the case—all things claimed by Prince at trial. Prince also argues that the State improperly argued his post-*Miranda* silence by offering into evidence the audio recordings of his phone calls from jail to his mother and grandfather in which he told them he could not talk about the case. Finally, Prince argues that the State improperly commented on his post-*Miranda* silence in closing argument when it argued that in the phone call to his grandfather, Prince told him that he was charged with murder and that they got Ladiner, too. The State suggested this

would have been an obvious opportunity for Prince to state that he was driving and that Ladiner was the shooter, and that his failure to do so suggested that in fact Prince was the shooter.

The State is prohibited from using an accused's silence, at the time of arrest and after receiving *Miranda*[6] warnings, for impeachment purposes. However, this rule against the admissibility of an accused's post arrest, post-*Miranda* silence does not apply if the accused chooses not to exercise his or her right to remain silent and elects, instead, to make a statement while in custody. *State v. Anthony,* 857 S.W.2d 861, 868 (Mo.App. W.D.1993) (citing *Doyle v. Ohio,* 426 U.S. 610, 619, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976)). If the accused voluntarily speaks post-*Miranda,* he can be impeached on his statements and his selective silence. *State v. Hutchison,* 957 S.W.2d 757, 763 (Mo. banc 1997).

■■■ Prince's reliance on protection pursuant to *Miranda* is misplaced. *Miranda* is limited to custodial interrogations initiated by law enforcement. *Miranda* does not apply in this case because " '[r]ecording a telephone conversation between a defendant and a third party does not involve a "confrontation with governmental authority in the context of a custodial interrogation calling for *Miranda* warnings." ' " *State v. Sardeson,* 220 S.W.3d 458, 470 (Mo.App. S.D.2007) (quoting *State v. Barrett,* 41 S.W.3d 561, 565 (Mo.App. S.D.2001)). Therefore, Prince's statements, which were initiated by him, were voluntary, spontaneous, and properly admitted. *Id.* Important to this case, his selective silence on matters is equally admissible. *Hutchison,* 957 S.W.2d at 763.

Prince concedes that most cases involving violations by comment on post-*Mi-*

---

6. *Miranda v. Arizona,* 384 U.S. 436, 479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

*randa* silence concern failure to explain conduct to police but contends, nonetheless, that a violation can also be found in the use of jail conversations. Prince relies on *Franklin v. Duncan,* 884 F.Supp. 1435 (N.D.Ca.1995). *Franklin* is neither controlling nor compelling in light of *Sardeson.*[7] The only Missouri case that Prince relies on is *State v. Dexter,* 954 S.W.2d 332 (Mo. banc 1997), which involved the testimony of the arresting officer that Dexter refused to answer any questions after he was arrested without an attorney present, and the State's cross-examination of Dexter at trial regarding his silence after he was placed under arrest—fact patterns that are materially dissimilar to this case.

Prince fails to satisfy the first step of the plain error analysis. We find no plain error. Point five is denied.

## Point VI

For his sixth and final point, Prince claims that the trial court abused its discretion in denying his motion for continuance to obtain police reports and to investigate whether, and to what extent, Ladiner was involved in a murder in the state of California. Prince claims that the State created the need for the continuance by its late disclosure of the California murder. Prince claims he needed to investigate Ladiner's involvement to establish Ladiner's bias in his willingness to lie and implicate his family to save himself from criminal liability.

### Standard of Review

We review the trial court's denial of a motion for continuance for abuse of discre-

tion. *State v. Clark,* 263 S.W.3d 666, 669 (Mo.App. W.D.2008). We will reverse the denial of a motion for continuance only when the trial court enters a ruling that is clearly illogical and is arbitrary and capricious. *Id.* "A 'very strong showing' is required to prove abuse of that discretion, and the party requesting the continuance bears the burden of showing prejudice." *State v. Thompson,* 985 S.W.2d 779, 785 (Mo. banc 1999) (citation omitted).

### Analysis

Prince claims that the State disclosed that Ladiner cooperated in a murder investigation in California and that the California authorities refused to send defense counsel any records. In his deposition, Ladiner denied any involvement in the murder and denied being an informant. Prince contends that the State's late disclosure of Ladiner's alleged involvement in a murder in California required a continuance and that without a continuance, the defense was left with Ladiner's self-serving assertions that he was not involved and did not snitch on his family to save himself.

Prince cites to a line of cases that are distinguishable in that they all involve the State's late disclosure of witnesses or evidence *used at trial.* *State v. Whitfield,* 837 S.W.2d 503 (Mo. banc 1992) (Supreme Court held that a short delay was necessary for the defense to prepare to cross-examine the expert witness who was endorsed on the morning of trial, who linked the gun to the murder); *State v. Perkins,* 710 S.W.2d 889 (Mo.App. E.D.1986) (abuse of discretion in denying continuance to allow sufficient time to contact potential alibi witness where State dis-

---

7. *Franklin* involved a daughter, with prosecutorial involvement and the only eye witness against her father, going to the jail in an attempt to get her father to confess to murder. Father did not initiate the conversation and did not participate in any conversation. When daughter told father that "he should

tell the truth," he pointed to the sign that stated that "conversations may be monitored," and otherwise remained silent. The court held reference to Father's silence violated his right against self-incrimination. 884 F.Supp. at 1445–46.

closed written statement of defendant, which listed alibi witnesses, during voir dire); *State v. McIntosh,* 673 S.W.2d 53 (Mo.App. W.D.1984) (abuse of discretion in denying continuance due to late endorsement of witness on the day before trial whose testimony tended to refute or contradict defendant's version of events).

None of the cases cited by Prince are controlling in this case. Here, the State did not call any witness from the California case, and there was no indication that any investigation of that case would have aided in Prince's defense. Although Prince *generally* alleges that he was prejudiced by the State's late disclosure of the California case, he offers no indication of what *specific* prejudice resulted. Prince claims that the time to investigate the California matter was critical to see if evidence could be discovered that might demonstrate to the jury Ladiner's willingness to lie about his family in order to save himself. The argument is speculative and remote at best. There was sufficient other evidence before the jury which would have permitted the jury to question Ladiner's reliability as a witness, including his participation in the same crime for which Prince was being tried. There is simply no basis to conclude that time to investigate a tangential criminal proceeding to see whether or not some angle could be developed to further implicate Ladiner's credibility would have been productive.

The trial court did not abuse its discretion in denying Prince's motion for continuance. Point six is denied.

## Conclusion

We, therefore, affirm the trial court.

All concur.