**STATE of Missouri, Respondent,**

v.

**Damon Alshawn WILLIAMS,
Appellant.**

**No. WD 71868.**

Missouri Court of Appeals,
Western District.

Nov. 22, 2011.

Margaret M. Johnston, Assistant State Public Defender, Columbia, MO, for Appellant.

Chris Koster, Attorney General, Richard A. Starnes, Assistant Attorney General, Jefferson City, MO, for Respondent.

Before Division Two: MARK D. PFEIFFER, Presiding Judge, VICTOR C. HOWARD, Judge and CYNTHIA L. MARTIN, Judge.

VICTOR C. HOWARD, Judge.

Damon Williams appeals his convictions following a jury trial for one count of murder in the first degree, section 565.020,[1] robbery in the first degree, section 569.020, and armed criminal action, section 571.015. On appeal, Williams claims that the trial court abused its discretion when it admitted testimony from Detective John Short regarding a witness statement. Williams further claims that the trial court plainly erred in *sua sponte*

1. All statutory citations are to RSMo 2000, unless otherwise noted.

setting aside his guilty plea. The convictions are affirmed.

## Factual and Procedural Background

On the evening of June 9, 2008, Damon Williams was staying in a room at a Motel 6 in Columbia, Missouri. Williams was hanging out and smoking marijuana with several friends, including Michael Jaco, Malcolm Washington, Quillan Jacobs, and Denzell Smith. When the group ran out of marijuana, they initially decided to try to buy some more. Eventually, they instead decided to rob someone of marijuana and money.

Jaco and Washington both had handguns that they brought with them. Washington drove the group around while they looked for a target. Jacobs told the group that he knew a person at a certain house who had marijuana. He directed Washington to drive to 3610 Pimlico Drive, and Washington parked down the road from the house. Williams, Jaco, and Washington were going to go in the house and commit the robbery while Jacobs and Smith stayed in the car. Williams, Jaco, and Washington each had on a hooded sweatshirt which they used to cover their heads; each of them covered the bottom part of their faces with either a t-shirt, a towel, or a bandana.

At the time of the robbery, the house was occupied by its three residents: Jerale Nichols, Jordan Davis, and Nathan Bentley. Nichols was downstairs in the living room playing video games with two friends, Davis was asleep in his downstairs bedroom with his girlfriend, and Bentley was asleep in his bedroom upstairs. The three intruders entered through the back door. By that time, Jaco had given Williams his gun. The intruders told Nichols and his friends that they wanted money and drugs and made them kneel in front of the couch and face the wall.

Davis woke up when he heard Nichols and the intruders talking loudly. The door to Davis's bedroom was locked, and he heard someone jiggle the doorknob. Davis turned the light on and started walking toward the door when Jaco kicked the door in. Davis came out of his room and saw two men pointing guns at him. The men made Davis kneel in front of the couch in the living room.

Meanwhile, Jaco went upstairs and entered Bentley's room. He did not see Bentley sleeping in the bed but saw money and a small bag of marijuana on a table. After taking the items downstairs, Jaco went back upstairs to look for more items to take. This time, he saw Bentley in his bed. He ran back downstairs and told the other two intruders that there was someone upstairs. Jaco and Washington wanted to leave, but Williams went upstairs. Jaco told Washington to go get Williams, so Washington gave Jaco his gun and followed Williams upstairs.

From downstairs, witnesses heard Williams repeatedly yelling at Bentley to get out of bed. They heard the sound of scuffling and then a gunshot. Washington then ran down the stairs followed by Williams. Williams walked toward Davis, put a gun close to his head, and said, "We're capping niggers in 2008." The three men took the items they had collected and ran out the back door. After the intruders left, the occupants of the home went upstairs to Bentley's room and found that he had been shot. He soon thereafter died of a gunshot wound to the head.

Williams, Jaco, and Washington ran back to the car and got in. Williams told the others that he had shot the victim in the head. The group drove out onto some back roads so they could attempt to dispose of the evidence. They threw the items they had taken into a creek bed, and Williams wrapped the gun in a towel and hid it in the woods.

When investigating the crime scene, Columbia police officers found a .380 shell casing in Bentley's bedroom. One of the victims consented to the police "pinging" her cell phone, which the intruders had taken. The GPS system in the phone led police to the location where the intruders had discarded the items they had taken. While searching the area, officers discovered a gun wrapped in a white towel. It was later determined that this gun had fired the bullet that killed Bentley. A mixture of DNA was recovered from the white towel, but an exact match could not be determined. However, Jaco, Jacobs, and Smith were eliminated as possible contributors, while Williams and Washington could not be eliminated.

On June 11, Jaco and Washington heard from family members that the police were looking for them, and they decided to turn themselves in. When Jaco spoke with the police, he initially tried to minimize his involvement in the robbery, but eventually admitted that he participated in the robbery. Jaco identified all of the individuals involved in the crime.

On June 12, the police learned that Williams was staying in a room at the Eastwood Motel in Columbia. Police made contact with Williams and after approximately one hour, Williams came out and surrendered himself. After his arrest, Williams spoke with the police. He denied any involvement in the crime and claimed that he did not know any of the other individuals involved.

A jury found Williams guilty of all the counts charged. The trial court sentenced Williams to life without the possibility of probation or parole for murder in the first degree, a concurrent term of twenty years for robbery in the first degree, and a consecutive term of fifteen years for armed criminal action. This appeal by Williams followed.

## Admission of Detective Short's Testimony

In his first point on appeal, Williams contends that the trial court abused its discretion in overruling his objections to the testimony of Detective John Short regarding his two interviews with Jaco. Williams argues that Detective Short's testimony improperly bolstered Jaco's testimony and that the introduction of Jaco's prior consistent statements was not limited to the subject of impeachment.

The trial court has broad discretion regarding the admission or exclusion of evidence at trial, and we will not disturb its decision absent a clear abuse of discretion. *State v. Prince*, 311 S.W.3d 327, 335 (Mo.App. W.D.2010). "A trial court abuses its discretion when the decision is against the logic of the circumstances and when it is so arbitrary and unreasonable as to shock the sense of justice and indicates a lack of careful consideration." *State v. Chism*, 252 S.W.3d 178, 182 (Mo. App. W.D.2008) (internal quotations omitted). " 'A conviction will be reversed due to admission of improper evidence only if the defendant proves prejudice by showing a reasonable probability that in the absence of such evidence the verdict would have been different.' " *State v. Tillman*, 289 S.W.3d 282, 294 (Mo.App. W.D.2009) (quoting *State v. Thompson*, 112 S.W.3d 57, 63 (Mo.App. W.D.2003)).

After turning himself in, Jaco was interviewed by the police two times. Although he initially lied to the police, he eventually admitted that he participated in the robbery and identified the others that were involved. Jaco told the police that he gave Williams the gun as they were entering the house. He stated that Williams and Washington went upstairs and that he heard scuffling and then a gunshot. After the gunshot, the two men came back down-

stairs, and Williams said that he had shot Bentley.

Sometime after the two interviews occurred, Jaco and the State entered a plea agreement. Jaco agreed to plead guilty to first-degree robbery and to testify against Williams at trial. On cross-examination, counsel for Williams implied that Jaco fabricated his testimony in order to get a better deal from the State. The State thereafter presented the testimony of Detective Short. Detective Short testified regarding the statements Jaco made to him in the two interviews prior to the deal with the State. Those statements were consistent with Jaco's in-court testimony. Defense counsel objected to Detective Short's testimony, arguing that it improperly bolstered Jaco's testimony.

▉ "Improper bolstering occurs when out-of-court statements are offered solely to duplicate or corroborate trial testimony." *State v. Gaines*, 316 S.W.3d 440, 450 (Mo.App. W.D.2010). "Prior consistent statements are admissible for the purpose of rehabilitating a witness whose credibility has been attacked by an express or implied claim of recent fabrication of trial testimony." *State v. Ramsey*, 864 S.W.2d 320, 329 (Mo. banc 1993). " 'Statements consistent with trial testimony given before the corrupting influence to falsify occurred are relevant to rebut a claim of contrivance.' " *State v. Robinson*, 194 S.W.3d 379, 381 (Mo.App. W.D.2006) (quoting *Ramsey*, 864 S.W.2d at 329).

The circumstances of this case are indistinguishable from the facts of *Robinson*.[2] In that case, an individual involved in a robbery gave a statement to a detective admitting her involvement in the robbery and implicating the defendant. *Id.* at 380. In exchange for her testimony at trial, the State agreed to reduce the charge against her. *Id.* On cross-examination, defense counsel implied that the witness had fabricated her testimony in exchange for a deal. *Id.* The State then introduced the testimony of a detective regarding what the witness said to him about the robbery. *Id.* When defense counsel objected, the State argued that the testimony was necessary to show prior consistent statements by the witness due to the attack on her credibility. *Id.* This court found that the admission of the testimony was not error where it was relevant for the purposes of rehabilitation after an implication that the witness's testimony was fabricated in exchange for a reduced charge. *See id.* at 381.

In this case, Jaco received a deal and testified against Williams at trial. Defense counsel implied that his testimony was fabricated in order to get a better deal from the State. The testimony from Detective Short was not offered solely to duplicate or corroborate Jaco's testimony; rather, the prior consistent statements were admissible for the purpose of rehabilitating Jaco's credibility. Therefore, the testimony did not constitute improper bolstering. *See id.* Williams's first point is denied.

### Rejection of Williams's Guilty Plea

In his second point on appeal, Williams asserts that the trial court plainly erred in *sua sponte* setting aside Williams's guilty plea because the trial court had no authority to set aside the guilty plea once it had accepted the plea.

---

**2.** Williams cites *State v. Cole*, 867 S.W.2d 685 (Mo.App. E.D.1993), for the proposition that prior consistent statements must be limited to the extent necessary to counter the subject on which the witness was impeached. *See id.* at 686. In *Cole*, the court found that improper bolstering occurred where the State played the entire tape-recorded statement of a witness, and defense counsel had impeached the witness with only four specific inconsistent statements. *Id.* This case is distinguishable in that defense counsel implied that the entirety of Jaco's testimony was fabricated in order to receive a better deal from the State.

Williams concedes that his contention was not preserved and, therefore, asks for plain error review. Rule 30.20 grants an appellate court authority to review, in its discretion, "plain errors affecting substantial rights ... when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." The plain error rule should be used sparingly and does not justify a review of every alleged trial court error that has not been properly preserved for appellate review. *State v. White*, 92 S.W.3d 183, 189 (Mo. App. W.D.2002). Plain error review involves a two-step process. *Id.* First, the reviewing court must determine whether the claim of plain error, on its face, establishes substantial grounds for believing that manifest injustice or miscarriage of justice has occurred. *State v. DeWeese*, 79 S.W.3d 456, 457 (Mo.App. W.D.2002). An error is plain if it is evident, obvious, and clear. *Id.* If evident, obvious, and clear error is found on the face of the claim, the appellate court may, in its discretion, then determine whether manifest injustice or a miscarriage of justice resulted therefrom. *Id.*

On July 24, 2009, Williams appeared before the trial court to enter a guilty plea pursuant to a plea agreement. Williams told the court he wished to enter an open plea in exchange for a reduced charge of felony murder and the dismissal of the robbery and armed criminal action counts. The trial court entered a plea of guilty to felony murder and ordered a sentencing assessment report. The court discharged Williams as to the other two counts. The prosecutor stated a concern that Williams's accomplices were scheduled for sentencing and that if Williams "gets in there and tells his probation officer that he's really not guilty, that he just pled, you know, that then all the co-defendants have now been sent down to the Department of Corrections or something."

The court stated that it would not sentence the co-defendants until Williams had been sentenced. The court then said to Williams: "And do you understand, Mr. Williams, that if you tell the probation officer something different than you've told me, I'm not going to accept your plea? Do you understand that?" Williams said that he understood.

On August 5, 2009, Williams sent a letter to the court in which he stated that he was innocent. He said he had no choice but to plead guilty because everyone was falsely implicating him. He asked the court to show him mercy because he was innocent. Williams appeared before the court on August 24, 2009. The court addressed Williams and said it had "received a letter from you indicating that you're an innocent man; you just pled guilty because it was the easy thing to do. Is that the way it was?" Williams agreed that that was the way it was. The court stated that it did not sentence innocent people and therefore refused to accept Williams's guilty plea.

Williams argues that the trial court exceeded its authority in *sua sponte* setting aside his guilty plea after it had already accepted the plea. Acceptance of a guilty plea "typically occurs at the conclusion of the plea proceeding." *State v. Creamer*, 161 S.W.3d 420, 425 (Mo.App. W.D.2005). "[T]he trial court has virtually unlimited discretion prior to acceptance of the plea to refuse any plea of guilty outright or to reject any plea bargain between the State and the defendant." *Id.* Upon the court's unqualified acceptance of a guilty plea, double jeopardy attaches. *Id.*

In *Creamer*, this court found that the plea court had committed plain error where it *sua sponte* set aside a defendant's guilty plea after the court had already accepted the plea without qualification. *See id.* at 427. This case is distinguishable from *Creamer* in that the trial court clear-

ly indicated to Williams that it was not accepting his plea without qualification when it informed Williams that it would not accept his guilty plea if he later attempted to maintain his innocence. *Creamer* itself notes that "Rule 24.02(d)(2) permits the plea court to defer the decision of whether or not to accept the plea until it has an opportunity to consider the presentence investigation report." *Id.* at 425 n. 6. The trial court followed that procedure here, in response to the State's concerns as to the position Williams might take in connection with the preparation of that report. Therefore, because the court had not yet accepted the plea without qualification, it had virtually unlimited discretion to refuse the plea or reject the plea bargain. The trial court did not exceed its authority in refusing to accept Williams's plea. Williams's second point on appeal is denied.

The convictions are affirmed.

All concur.